*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 23**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

CHARLES DAHL,
*Petitioner and Appellee,*

*v.*

KIM DAHL,
*Respondent and Appellant.*

KIM DAHL,
*Appellant,*

*v.*

MARLETTE ENTERPRISES, LLC;  C. ROBERT DAHL,
DAHL FAMILY IRREVOCABLE TRUST; and CHARLES DAHL,
*Appellees.*

Nos. 20100683, 20111077
Filed January 30, 2015

Fourth District, Provo Dep't
The Honorable James R. Taylor
The Honorable Lynn W. Davis
Nos. 064402232, 090402989

Attorneys:

Steve S. Christensen, Craig L. Pankratz, Samuel J. Sorensen,
Salt Lake City, Sara Pfrommer, Park City,
for petitioner and appellant

Rosemond G. Blakelock, Ryan D. Petersen, Provo,
for respondent and appellee

JUSTICE PARRISH authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE NEHRING, JUDGE TODD M. SHAUGHNESSY,
and JUDGE W. BRENT WEST concurred.

JUSTICE DURHAM authored an opinion concurring in part and
dissenting as to Part III.C.2.d.

Having recused themselves, CHIEF JUSTICE DURRANT and
JUSTICE LEE did not participate herein; DISTRICT JUDGES
TODD M. SHAUGHNESSY and W. BRENT WEST  sat.

JUSTICE PARRISH, opinion of the Court:

## INTRODUCTION

¶1     These interrelated cases arise from the marriage dissolution of Dr. Charles Dahl and Ms. Kim Dahl.  On appeal of the divorce case, Ms. Dahl challenges the district court's substantive rulings on alimony, child custody, and distribution of the marital estate. She additionally challenges the district court's rulings on judicial bias, evidentiary issues, and attorney fees.  Ms. Dahl also appeals the outcome of a separate, but related, lawsuit involving marital assets contained in the Dahl Family Irrevocable Trust (Trust).  Although these cases came before this court separately, we consolidate them, sua sponte for the purposes of appeal and remand, based on our conclusion that the Trust should have been joined as a party to the divorce action.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     Due to the complex factual and procedural history of these cases, we provide only a brief overview of the underlying facts here. We will discuss the relevant facts in more detail below as they relate to our resolution of the various issues.

¶3     Dr. Charles Dahl and Ms. Kim Dahl were married for nearly eighteen years.  Dr. Dahl is a practicing cardiologist.  Ms. Dahl earned a master's degree in education and worked as an interior designer and school counselor prior to her marriage to Dr. Dahl.  During the couple's marriage, Ms. Dahl was the primary caregiver to the couple's two children, D.D. and C.D.,[1] and did not work outside the home.

¶4     Dr. Dahl filed for divorce on October 24, 2006.  Following years of pretrial proceedings, the divorce court conducted a bench trial over fourteen nonconsecutive days, beginning in September 2009.  The divorce court issued its Findings of Fact and Conclusions of Law on April 5, 2010, and the Decree of Divorce was entered July 20, 2010.

¶5     The divorce proceedings were extremely contentious. The parties fiercely disputed custody of their children, Ms. Dahl's right to temporary and permanent alimony, and the proper distribution

_____

[1] D.D. and C.D. were six and eleven years old, respectively, at the time the divorce action was initiated.

of the marital estate. The discovery process was rife with abuses on both sides, which delayed trial. The pretrial disclosure process was similarly fraught and ultimately resulted in the exclusion of most of Ms. Dahl's trial exhibits and expert witnesses. The district court aptly described the pretrial proceedings as a "train wreck."

¶6 On appeal of the divorce action, Ms. Dahl asserts several claims of error: (1) that the district court judge, Judge Taylor, was biased against her; (2) that the district court abused its discretion in various evidentiary rulings; (3) that the district court abused its discretion when it failed to award Ms. Dahl temporary and permanent alimony; (4) that the district court unfairly divided the marital assets in favor of Dr. Dahl; (5) that the district court erred in not considering joint custody of the couple's children; and (6) that the district court erred in not ordering Dr. Dahl to pay Ms. Dahl's attorney fees. We affirm in part, reverse in part, and remand for further proceedings.

¶7 Ms. Dahl brought a separate action against the Trust, Marlette Enterprises, L.L.C., Dr. Dahl's real estate investment company, and C. Robert Dahl, Dr. Dahl's brother who served as the Trust's investment trustee (collectively Trust Defendants). In essence, Ms. Dahl sought a share of the Trust assets, which she claimed were marital property. Specifically, she sought declaratory judgment as to the parties' rights and obligations under the Trust, arguing that the Trust was null and void, that the Trust was revocable as a matter of law, that Ms. Dahl was a settlor of the Trust, and that she was entitled to an accounting from the Trust. The parties filed cross-motions for summary judgment, and the district court granted the Trust Defendants' motion, dismissing Ms. Dahl's claims. She asserts that the district court erred when it declared that she had no enforceable interest in Trust assets. We agree and therefore reverse.

¶8 Ms. Dahl's appeals of both the divorce action and the trust action came before the court of appeals. The court of appeals certified both appeals to us. We have jurisdiction pursuant to section 78A-3-102(3)(b) of the Utah Code.

**ANALYSIS**

I. CONSOLIDATION OF THE DIVORCE
AND TRUST ACTIONS

¶9 As an initial matter, we address Ms. Dahl's failure to join the Trust in the divorce action. Despite years of pretrial proceedings

in the divorce action, counsel for Ms. Dahl failed to join the Trust as a defendant. Then, just weeks before the start of the divorce trial, Ms. Dahl's attorneys initiated the separate lawsuit against the Trust. The divorce court refused to consider the Trust assets in distributing the marital estate, ruling that the eve of trial was too late to join a new party and that it could not consider Trust assets that were the subject of other pending litigation. Given Ms. Dahl's failure to join the Trust as a defendant in the divorce action, we do not fault the divorce court for refusing to consider the Trust assets.

¶10 Courts may "make a legally binding adjudication only between the parties actually joined in the action." *Hiltsley v. Ryder*, 738 P.2d 1024, 1025 (Utah 1987); *see also R.M.S. Corp. v. Baldwin*, 576 P.2d 881, 883 (Utah 1978) (holding that no judgment could be entered against a corporation not joined as a party before the court). Because of Ms. Dahl's failure to add the Trust as a party, the district court was correct that it had no power to adjudicate the parties' rights in the Trust assets.

¶11 The Trust assets included marital property. Without the power to consider and distribute the Trust assets, the district court lacked the authority to fully and fairly distribute the marital estate. Accordingly, the Trust should have been joined as a party to the divorce action.[2] Counsel's failure to join the Trust prevented the district court from considering the Trust and its assets and therefore prevented a complete distribution of the marital estate. But we are now in a position to consider the Trust and its assets because both the Trust and divorce cases are before us. And "appellate courts may raise the issue [of joinder] *sua sponte*." *Hiltsley*, 738 P.2d at 1025. Accordingly, we hereby consolidate the Trust and divorce cases for purposes of appeal.[3] And we remand both cases to the district court

---

[2] Rule 19(a) of the Utah Rules of Civil Procedure provides in pertinent part: "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of action *shall be joined* as a party in the action if . . . in his absence complete relief cannot be accorded among those already parties." (Emphasis added).

[3] Dr. Dahl filed a suggestion of mootness in the divorce action on February 28, 2013, arguing that Ms. Dahl's claims to a share of the Trust assets were mooted by the grant of summary judgment in favor of the Trust Defendants in the parallel Trust action. Because

(continued...)

that handled the divorce case and direct it to join the Trust as a party to the divorce action.

## II. THE TRUST ACTION

¶12 On July 31, 2009, Ms. Dahl brought an action seeking a declaration of her rights in the Trust assets and requesting an accounting of the Trust's activities and a copy of the Trust agreement. Following discovery, both parties moved for summary judgment. The district court held a hearing on the parties' cross-motions on August 31, 2011. At the conclusion of the hearing, the court instructed counsel for both parties to prepare orders consistent with their respective positions. Ultimately, the district court granted summary judgment in favor of the Trust Defendants and signed the order prepared by their counsel.

¶13 In adopting the order, the district court held that the Trust was irrevocable and that Ms. Dahl had no enforceable interest in the Trust assets. Though the Trust agreement contained a choice-of-law provision, the order did not specify whether the court was construing the Trust according to Utah or Nevada law. But it appears to have construed the Trust according to both Utah and Nevada law.

¶14 On appeal, Ms. Dahl argues (1) that the district court erred in its choice-of-law analysis, (2) that the court erred when it held that the Trust was irrevocable and that Ms. Dahl had no enforceable interest in Trust assets, and (3) that the district court exceeded its authority when it opined that the statute of limitations had lapsed on several claims not actually before it.[4]

¶15 Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." UTAH R. CIV. P. 56(c).

---

[3](...continued)
we are reversing the district court in the Trust action and consolidating these two cases on remand, Ms. Dahl's claims against the Trust are not moot.

[4] Ms. Dahl also initially argued that the district court erred when it granted summary judgment in favor of the Trust Defendants on Ms. Dahl's alter ego theory without first allowing her to conduct further discovery. Because Ms. Dahl withdrew this challenge in her reply brief, we do not address it.

Accordingly, we review the district court's grant of summary judgment for correctness and take "the facts and [any] inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Peterson v. Coca-Cola USA*, 2002 UT 42, ¶ 7, 48 P.3d 941.

¶16 Because Utah has a strong public policy interest in the equitable division of marital assets, we will not enforce the choice-of-law provision contained in the Trust. Instead, we construe the Trust according to Utah law. We hold that the Trust is revocable under Utah law and that Ms. Dahl has an interest in the Trust property as a settlor of the Trust. We further hold that the district court erred when it purported to adjudicate claims not properly before it. Before we address Ms. Dahl's specific claims of error, we first turn our attention to an inconsistency in the district court's order granting summary judgment in favor of the Trust Defendants.

*A. The District Court's November 11, 2011 Order*
*Is Internally Inconsistent*

¶17 The district court adopted the order drafted by counsel for the Trust Defendants. That order was internally inconsistent. The order first addressed Ms. Dahl's request for declaratory judgment concerning the rights and duties of the parties vis-à-vis the Trust. After reviewing the law relating to declaratory judgment actions, the order stated that the court could "refuse to render or enter a declaratory judgment or decree where a judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy" between the parties. It then stated that because a declaratory judgment would not terminate the parties' dispute, it would decline "to undertake the seemingly meaningless task of declaring the rights and duties of the parties to [the] action."

¶18 Despite this language, which states that the district court was declining to order any declaratory relief, the order goes on to do just that. The order states that the Trust could not be rendered "null and void" on the basis of the facts presented by Ms. Dahl, that Ms. Dahl had no legally enforceable interest in the Trust assets, and that the Trust was irrevocable as a matter of law. Finally, the order states that Ms. Dahl did not have the right to a general accounting from the Trust. Because these rulings constitute a declaration as to the matters in dispute, they are inconsistent with the prior ruling that the court was declining to declare the rights of the parties in this

matter.[5]

¶19 When confronted with an ambiguous order, we will construe it using the same rules that apply to all legal documents. *Culbertson v. Bd. of Cnty. Comm'rs*, 2001 UT 108, ¶ 15, 44 P.3d 642, *overruled on other grounds by Madsen v. JPMorgan Chase Bank, N.A.*, 2012 UT 51, 296 P.3d 671. We first "look to the language of the order," and "[may] resort to the pleadings and findings." *Id.* Our task is to "interpret an ambiguity [in a manner that makes] the judgment more reasonable, effective, conclusive, and [that] brings the judgment into harmony with the facts and the law." *Id.* (alterations in original) (internal quotation marks omitted). And we will "construe any ambiguities in the order against the prevailing parties who drafted it." *Id.*

¶20 Though purporting to deny declaratory relief, the order goes into great detail in articulating the parties' respective rights and duties as to the Trust. Indeed, it carefully articulates Ms. Dahl's various claims and rules on each. And because the order was drafted by counsel for the Trust Defendants, we construe any ambiguity in favor of Ms. Dahl. Accordingly, we strike those paragraphs of the order declining to award declaratory relief as surplusage that is inconsistent with the order as a whole.

¶21 Having dealt with the inconsistency in the district court's order, we turn our attention to Ms. Dahl's substantive claims.

*B. We Construe the Trust According to Utah Law*

¶22 Ms. Dahl argues that the district court erred when it applied Nevada law and construed the Trust as irrevocable. She argues that construing the Trust as irrevocable under Nevada law would violate Utah public policy by creating "a serious inequity" in the distribution of the marital estate. In response, Dr. Dahl argues that the Trust is irrevocable under both Utah and Nevada law and, therefore, the Trust's choice-of-law provision is "not material in this case." Dr. Dahl concedes that Ms. Dahl has an enforceable interest in the Trust assets if we find the Trust to be revocable. While both

---

[5] This case illustrates the potential pitfalls of reliance on orders drafted by counsel. Such orders do not necessarily reflect the reasoning of the court and, accordingly, courts should exercise caution when asking counsel to draft them. Moreover, counsel should take care to ensure that any order they draft does not overreach.

parties agree that application of Nevada law would require us to hold the Trust irrevocable,[6] they disagree as to the result under Utah law. Accordingly, our first task is to determine which state's law governs construction of the Trust.

¶23 Because Utah is the forum state, Utah choice-of-law rules apply. *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 14, 54 P.3d 1054. Under Utah choice-of-law rules, we will generally enforce a choice-of-law provision contained in a trust document, unless doing so would undermine a strong public policy of the State of Utah. *See* UTAH CODE § 75-7-107 & cmt. ("This section does not attempt to specify the strong public policies sufficient to invalidate a settlor's choice of governing law."); *see also Jacobsen Constr. Co. v. Teton Builders*, 2005 UT 4, ¶ 19, 106 P.3d 719 (refusing to allow parties to "employ choice of law provisions to force forum states to enforce contractual terms wholly repugnant to local public policy"). Thus, we will refuse to enforce a settlor's choice-of-law provision if doing so would undermine strong public policy goals of this state.

¶24 Section 5.4.6 of the Trust agreement provides:

> *Governing Law.* The validity, construction and effect of the provisions of this Agreement in all respects shall be governed and regulated according to and by the laws of the State of Nevada. The administration of each Trust shall be governed by the laws of the state in which the Trust is being administered.

Issues concerning the meaning of trust terms, the legal effect of those terms, and the status of individuals vis-à-vis the Trust are all matters of trust construction. *See* BLACK'S LAW DICTIONARY 355, 592 (9th ed. 2009) (defining "construction" and "effect"). Conversely, questions related to the performance of the trustee's duties and the management of trust assets are issues of trust administration. *See id.* at 49 (defining "administration"); 90 C.J.S. *Trusts* § 225. The central

---

[6] Surprisingly, both parties rely almost exclusively on Utah law in their briefing. Throughout both parties' briefs, only one Nevada statute—Nevada Revised Statutes section 163.560—is cited, and neither party adequately briefs the effect of Nevada law on the Trust's revocability. Because we conclude that Utah's public policy interest in the equitable division of the marital estate requires us to construe the Trust according to Utah law, we need not determine whether the Trust would be revocable under Nevada law.

dispute between the parties in this case concerns the revocability of the Trust. This is an issue of trust construction to which we would ordinarily apply Nevada law. But we cannot apply Nevada law without violating Utah public policy.

¶25    Utah has a long-established policy in favor of the equitable distribution of marital assets in divorce cases. *See* UTAH CODE § 30-3-5(1) (authorizing Utah courts to enter "equitable orders relating to the children, property, debts or obligations, and parties" in a divorce); *see also Englert v. Englert*, 576 P.2d 1274, 1276 (Utah 1978) ("The import of our decisions implementing [section 30-3-5] is that proceedings in regard to the family are equitable in a high degree; and that the court may take into consideration all of the pertinent circumstances. It is our opinion that the correct view under our law is that this encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived."). We have previously indicated that the purpose of section 30-3-5 of the Utah Code is to empower courts to "enforce, after divorce, the duty of support which exists between a husband and wife." *Callister v. Callister*, 261 P.2d 944, 948 (Utah 1953). Moreover, "[t]he overarching aim of a property division, and of the decree of which it and the alimony award are subsidiary parts, is to achieve a fair, just, and equitable result between the parties." *Noble v. Noble*, 761 P.2d 1369, 1373 (Utah 1988). Thus, by legislative enactment and our long-standing precedent, Utah has an interest in ensuring that marital assets are fairly and equitably distributed during divorce and that divorcing spouses both retain sufficient assets to avoid becoming a public charge.

¶26    To this end, Utah law presumes that property acquired during a marriage is marital property subject to equitable distribution. *See Woodward v. Woodward*, 656 P.2d 431, 432–33 (Utah 1982) ("The essential criterion is whether a right to the benefit or asset has accrued in whole or in part during the marriage. To the extent that the right has so accrued it is subject to equitable distribution."). Thus, to the extent that the Trust corpus contains marital property, Utah has a strong interest in ensuring that such property is equitably divided in the parties' divorce action.

¶27    Dr. Dahl admits that at least some of the Trust assets originated as marital property. For example, Ms. Dahl conveyed her interest in the couple's marital home to the Trust via a warranty deed. In addition, Ms. Dahl claims to have conveyed to the Trust her interest in Marlette Enterprises and other marital property with a

value of at least $2 million.[7]  Because Utah has a strong policy of equitable distribution of marital assets, we decline to enforce the Trust's choice-of-law provision on the grounds that doing so would deny the district court the ability to achieve an equitable division of the marital estate.  We therefore construe the Trust according to Utah law.

### C. *Because the Trust Is Revocable Under Utah Law, Ms. Dahl Has an Enforceable Interest in the Trust Property*

¶28  Having determined that we will construe the Trust according to Utah law, we turn our attention to whether the Trust is revocable and, if so, what interest Ms. Dahl has in the Trust assets.

1. The Trust Is Revocable Because Dr. Dahl Reserved an Unrestricted Power to Amend

¶29  Ms. Dahl argues that the Trust is revocable under Utah law because Dr. Dahl, as settlor of the Trust, reserved in the Trust agreement an unrestricted power to amend the Trust.[8]  We employ familiar principles of contract interpretation when construing trust instruments.  *Makoff v. Makoff*, 528 P.2d 797, 798 (Utah 1974).  We begin our analysis with the language of the trust agreement to ascertain the intent of the settlor.  *Id.*  Because we presume that the settlor knew and intended the legal effect of the language used, we give the words used in the trust agreement their ordinary and usual

---

[7] Though Dr. Dahl argues that Ms. Dahl received half of the marital assets in the divorce proceedings, the marital assets contributed to the Trust were not considered by the district court in the divorce action.  The fact that these assets were contributed to the Trust does not change their marital quality and Ms. Dahl is therefore entitled to her fair share of these assets.

[8] Ms. Dahl asserts that such an unrestricted power to amend violates the sole beneficiary rule because Dr. Dahl could simply amend the Trust to make himself the sole beneficiary.  And once he became the sole beneficiary, Dr. Dahl could give unanimous consent as settlor and sole beneficiary to dissolve the Trust.  *See* UTAH CODE § 75-7-411(1) ("A noncharitable, irrevocable trust may be modified *or terminated* upon consent of the *settlor and all beneficiaries*, even if the modification or termination is inconsistent with a material purpose of the trust." (Emphasis added).).  We need not address this argument because we conclude that the unrestricted power to amend, by itself, renders the Trust revocable under Utah law.

meaning.  *See* 76 AM. JUR. 2D *Trusts* § 33 (2005) ("[T]he words used in a trust instrument are to be taken in their ordinary and grammatical sense unless a clear intention to use them in another sense can be ascertained.").

¶30   Section 5.5 of the Trust agreement states, "*Trust Irrevocable. The Trust hereby established is irrevocable. Settlor reserves any power whatsoever* to alter or amend *any* of the terms or provisions hereof."  (Emphasis added).  Dr. Dahl argues that the Trust is irrevocable because it is entitled "The Dahl Family Irrevocable Trust" and section 5.5 declares it to be irrevocable.[9] Dr. Dahl further argues that section 5.5 "does not create any right for Dr. Dahl to unilaterally alter or amend the Trust.  Rather, the language simply reserves the rights of every settlor of an irrevocable trust . . . to amend, alter or terminate the irrevocable trust if there is consent from all beneficiaries."  We are unpersuaded.

¶31   A "settlor has power to modify the trust if and to the extent that by the terms of the trust he reserved such a power." RESTATEMENT (SECOND) OF TRUSTS § 331(1) (1959).  The second sentence of section 5.5 reserves for Dr. Dahl, as settlor, *any power* to amend *any* provision of the Trust.  Though Dr. Dahl urges us to

---

[9] Dr. Dahl also relies on section 163.560 of the Nevada Revised Statutes, entitled "Irrevocable trust not to be construed as revocable," to support his assertion that the Trust is irrevocable.  Section 163.560 states:

> 1.  If the settlor of any trust specifically declares in the instrument creating the trust that such trust is irrevocable it shall be irrevocable for all purposes, even though the settlor is also the beneficiary of such trust.
> 2.  Such trust shall, under no circumstances, be construed to be revocable for the reason that the settlor and beneficiary is the same person.

Having concluded that Utah law applies, we need not address these provisions.  And in any event, section 163.560 only clarifies that an otherwise irrevocable trust will not be construed revocable merely because the settlor is also named as a beneficiary.  This section is best read as abrogating the sole beneficiary rule in Nevada.  *See De Lee v. Hicks*, 611 P.2d 211, 212 (Nev. 1980) (explaining that the sole beneficiary rule renders an otherwise irrevocable trust revocable).  It provides no insight as to whether the Trust should be deemed irrevocable in the first instance.

construe section 5.5 as reserving only those powers to amend that are consistent with the creation of an irrevocable trust, the plain language of section 5.5 contains no such limitation. By the terms of the Trust, Dr. Dahl can modify any and all Trust provisions, including the provisions that purport to make the Trust irrevocable. *See* MARY F. RADFORD ET AL., THE LAW OF TRUSTS AND TRUSTEES § 993 (3d ed. 2008) ("Although the holder of a power to modify may not directly revoke the trust, he or she may do so indirectly by first modifying the trust by the insertion of a power to revoke and then exercising that power." (footnote omitted)). Such a broadly drafted provision cannot fairly be read as restricting Dr. Dahl's power to amend to only those powers consistent with an irrevocable trust. Thus, by the Trust's plain language, Dr. Dahl has reserved an unrestricted power to amend.

¶32   In *In re Estate of Flake*, we held that a settlor's unrestricted power to amend a trust includes, by definition, the power to revoke the trust. 2003 UT 17, ¶ 13, 71 P.3d 589, *superseded on other grounds, Patterson v. Patterson*, 2011 UT 68, 266 P.3d 828 ("Ordinarily, if a power to modify is subject to no restrictions, then a reserved power to amend or modify includes the power to revoke."). Following our decision in *Flake*, the Legislature enacted the Utah Uniform Trust Code (UUTC), which governs the creation, administration, and adjudication of trusts in Utah. *See* UTAH CODE §§ 75-7-101 to -1201; *see also Patterson v. Patterson,* 2011 UT 68, ¶ 33, 266 P.3d 828 (discussing the adoption of the UUTC). Modeled on the Uniform Trust Code, Utah Code section 75-7-605 governs a settlor's power to revoke or amend a trust. Consistent with our ruling in *Flake*, the comments to section 75-7-605 make clear that an unrestricted power to amend a trust includes the power to revoke it. UTAH CODE § 75-7-605 cmt. ("An unrestricted power to amend may also include the power to revoke a trust."). And on this point, Utah law is consistent with the well-established rule from other jurisdictions.[10] Because Dr.

---

[10] *See, e.g.*, *Rubinson v. Rubinson*, 620 N.E.2d 1271, 1280 (Ill. App. Ct. 1993) (recognizing "the long-settled rule and the plethora of cases that have held that where the settlor reserves the unrestricted power to amend a trust, . . . that power may be used to terminate the trust"); *De Lee*, 611 P.2d at 212 ("An unrestricted power to modify . . . an intervivos trust includes the power to revoke the trust . . . ."); *Manice v. Howard Sav. Inst.*, 104 A.2d 74, 75 (N.J. Super. Ct. Ch. Div.

(continued...)

Dahl reserved an unrestricted power to amend any and all provisions of the Trust, we hold that the Trust is revocable under Utah law. Having so held, we now turn our attention to what rights, if any, Ms. Dahl has in the Trust assets.

2. Ms. Dahl Has the Right to Withdraw Her Contributions to the Trust

¶33   Dr. Dahl argues that Ms. Dahl has no enforceable interest in the Trust because, even if she is a settlor of the Trust, Utah law prohibits her from withdrawing her assets from an irrevocable trust. *See* UTAH CODE § 75-7-605(2). But we have held that the Trust is revocable under Utah law. Thus, the relevant inquiry centers on Ms. Dahl's rights in relation to a *revocable* trust.

¶34   Any interest retained by Ms. Dahl in the Trust must necessarily be based on her contribution of property to the Trust. This is so because Ms. Dahl is not a signatory to the Trust agreement. Nor is she named as a settlor or trustee. And Ms. Dahl's status as a beneficiary of the Trust is dependant on her status as Dr. Dahl's spouse. In section 1.2 of the Trust agreement, the beneficiaries are listed as "the Settlor during his lifetime," "the *Settlor's spouse*," "the Settlor's issue," and "any charitable or tax-exempt organization that may be added as a beneficiary." (Emphasis added). Because Ms. Dahl is named as a beneficiary only in her capacity as Dr. Dahl's spouse, her beneficiary status terminated with the couple's divorce. As a result, we must determine the extent to which Ms. Dahl's contribution of marital property to the Trust creates an enforceable interest in the Trust property.

¶35   Though we have not previously addressed this specific issue, the governing statute is clear. Section 75-7-103(1)(k) of the Utah Code defines "settlor" as "a person . . . who creates, or

---

[10](...continued)
1954) ("[A]n unrestricted power to modify includes a power to revoke the trust."); *Stahler v. Sevinor*, 84 N.E.2d 447, 448–49 (Mass. 1949) (holding that an unrestricted power to amend includes the power to revoke); *see also* RESTATEMENT (SECOND) OF TRUSTS § 331 cmt. h ("If the power to modify is subject to no restrictions, it includes a power to revoke the trust."); CHARLES E. ROUNDS, LORING: A TRUSTEE'S HANDBOOK 384 (2002) ("[I]nherent in the right to amend is the right to insert by amendment into the trust a revocation provision.").

contributes property to, a trust. If more than one person creates or contributes property to a trust, each person is a settlor of the portion of the trust property attributable to that person's contribution . . . ."

¶36   In this case, Ms. Dahl is not acknowledged as a settlor in the Trust agreement, even though Dr. Dahl admits that Ms. Dahl contributed property to the Trust. The Uniform Law Comments relating to the UUTC's definition of "settlor," on which the Utah statute is modeled, directly address such a situation.

> Determining the identity of the "settlor" is usually not an issue. The same person will both sign the trust instrument and fund the trust. Ascertaining the identity of the settlor becomes more difficult when more than one person signs the trust instrument or funds the trust. *The fact that a person is designated as the "settlor" by the terms of the trust is not necessarily determinative.* . . . Should more than one person contribute to a trust, all of the contributors will ordinarily be treated as settlors in proportion to their respective contributions, regardless of which one signed the trust instrument.

UTAH CODE § 75-7-103 cmt. (emphasis added).

¶37   A trust is created by the transfer of property by the owner to another person acting as trustee. *See* UTAH CODE § 75-7-401(1)(a); RESTATEMENT (SECOND) OF TRUSTS § 17(b) ("A trust may be created by . . . a transfer inter vivos by the owner of property to another person as trustee . . . ."). Regardless of whether Ms. Dahl is named as a settlor in the Trust agreement, she indisputably contributed property to the Trust. And there are no facts to support an inference that Ms. Dahl knowingly or intentionally forfeited her status as a settlor. Indeed, Ms. Dahl maintains that she was never given a copy of the Trust agreement and was unaware of its terms, including the fact that she was not named a settlor and that her status as a Trust beneficiary was dependent upon her status as Dr. Dahl's spouse. Dr. Dahl admits that Ms. Dahl "had nothing to do with the preparation of the Trust agreement . . . and did not sign the Trust or any related documents." Under these facts, we cannot conclude that Ms. Dahl relinquished her legal status as a settlor. Accordingly, we hold that Ms. Dahl remains a settlor of the Trust, regardless of the fact that she is not so named in the Trust agreement.

¶38    Because Ms. Dahl is a settlor of the Trust, she may revoke that portion of the Trust funded with either her separate or marital property.  Section 75-7-605(2) of the Utah Code states:

> If a revocable trust is created or funded by more than one settlor:
>
> (a) to the extent the trust consists of community property, the trust may be revoked by either spouse acting alone but may be amended only by joint action of both spouses; and
>
> (b) to the extent the trust consists of property other than community property, each settlor may revoke or amend the trust with regard to the portion of the trust property attributable to that settlor's contribution.[11]

By its plain language, section 75-7-605 allows Ms. Dahl, as a settlor of the Trust, to revoke the Trust as it relates to her contributed property—either marital or separate.  *See also* RESTATEMENT (THIRD) OF TRUSTS § 63 cmt. k (2003) ("If a revocable trust has more than one settlor, . . . each settlor . . . may revoke or amend the trust with regard to that portion of the trust property attributable to the settlor's contribution.").  On remand, the district court should consider the property contained within the Trust and determine whether it is fairly characterized as community, marital, or separate.[12]  It should then allow Ms. Dahl to revoke the Trust with

---

[11] Subsection (a) appears to apply only to property in community property states.  But subsection (b) allows Ms. Dahl to revoke the Trust as to any marital or separate property she contributed to it. For example, Ms. Dahl may revoke the Trust as to the marital home, which should be withdrawn from the Trust in its entirety and its value split equitably between Dr. and Ms. Dahl.  Alternatively, should Dr. Dahl wish to retain the marital property in the Trust, the district court may award an equitable offset of half the property's value to Ms. Dahl.

[12] We emphasize that the district court's determination relating to the nature of the property should be guided by well-established principles of Utah family law. *See Woodward v. Woodward*, 656 P.2d 431, 432–33 (Utah 1982) (holding that all property rights acquired during the pendency of the marriage are marital property).  For example, how the property is titled is of no consequence.  For the

(continued...)

regard to the portion of the Trust property attributable to either her separate property or any marital property.

¶39 Such a result accords with fundamental principles governing marital property under Utah law. Were we to decide that Ms. Dahl had no enforceable interest in the Trust, despite having contributed marital property to it, the result would be to allow a spouse to shield marital property from equitable division in the event of divorce. And that is exactly what Dr. Dahl attempted to do in this case. He crafted a trust agreement purporting to eliminate any interest Ms. Dahl had in the Trust property upon the couple's divorce. But Utah law does not allow spouses to place marital assets in revocable trusts and then shield those assets from equitable property division in the event of a divorce.[13]

### D. *The District Court Erred When It Purported to Rule on Issues Not Before It*

¶40 In its November 11, 2011 order, the district court granted summary judgment in favor of the Trust Defendants on Ms. Dahl's request for a determination that the Trust was "null and void." The court recognized, correctly, that "null and void" is not a valid cause of action. It went on to note, "There are no material factual allegations in the Amended Complaint that accuse the Defendants of fraud, mistake, duress, undue influence, illegality or otherwise contend that the trust is violative of public policy or contrary to law or statute." Despite the acknowledgment that such claims were not before it, the order states in a footnote:

---

[12](...continued) purpose of equitable distribution, the court must determine whether the property was acquired during the marriage. Once the court determines that a particular piece of property is marital, Ms. Dahl may revoke her contribution of that property in its entirety, and the court may then divide the property equitably.

[13] Were we to construe the Trust as irrevocable, it would create a serious conflict between trust law and divorce law in Utah. The question of whether a spouse could create an irrevocable trust in which he or she placed marital property, thereby frustrating the equitable distribution of property in the event of a divorce, is not before us in this case. Accordingly, we take no position on a likely outcome of such conflict. Rather, we bring the potential pitfalls to the Legislature's attention.

However, even if the Plaintiff were to make such a claim, the statute of limitations has passed on all causes of action related to those theories. U.C.A. 78B-2-305 (2010 as Amended) limits actions based on the grounds of fraud or mistake to three years. 78B-2-307 (2010 as Amended) limits actions based upon a contract, obligation, or liability not founded upon an instrument in writing as well as other actions not detailed in the statute to four years. 78B-2-309 (2010 as Amended) limits actions based upon any contract, obligation, or liability founded upon an instrument in writing, to six years.

¶41 Ms. Dahl argues that it was improper for the district court to render an advisory opinion on claims not before it. We agree. As the order concedes, Ms. Dahl did not bring claims of fraud, mistake, duress, or undue influence as grounds for finding the Trust voidable. As such, any possible defenses to such claims cannot have been fully and fairly litigated before the district court. Thus, the district court's pronouncement with respect to the validity of such potential claims can have no preclusive effect. *See Macris & Assocs., Inc. v. Neways, Inc.*, 2000 UT 93, ¶ 37, 16 P.3d 1214 (requiring that an "'issue must have been competently, fully, and fairly litigated'" to have preclusive effect).

¶42 In summary, because the district court's November 11, 2011 order was internally inconsistent, we strike those paragraphs of the order indicating that it declined to enter a declaratory judgment as inconsistent with the holding of the court. As to Ms. Dahl's substantive claims, we construe the Trust agreement according to Utah law based on Utah's long-standing public policy interest in the equitable division of marital assets upon divorce. We conclude that Dr. Dahl reserved an unrestricted power to amend the Trust in the Trust agreement. Under Utah law, this unrestricted power to amend gave Dr. Dahl the power to revoke the Trust, thereby rendering the Trust revocable. Because Ms. Dahl contributed marital property to the Trust, she retains the status of settlor and may revoke the Trust as to her contribution of both her separate property and any marital assets. We therefore remand the trust case, which we have consolidated with the divorce case, to the divorce court for purposes of equitably distributing those Trust assets that are marital property. Finally, we vacate that portion of

the court's November 11, 2011 order purporting to opine on claims not before it.

## III.  THE DIVORCE CASE

¶43    We now turn to Ms. Dahl's appeal in the divorce case.  Ms. Dahl raises multiple claims of error and requests that we reverse and remand the case for an entirely new trial.  First, Ms. Dahl contends that she is entitled to a new trial because the district judge was biased against her.  Second, Ms. Dahl asserts that the district court abused its discretion in several of its pretrial evidentiary rulings by (1) failing to compel discovery, (2) excluding many of Ms. Dahl's proposed trial exhibits, and (3) limiting the testimony of Ms. Dahl's expert witnesses.  Third, Ms. Dahl argues that the district court abused its discretion when it refused to award Ms. Dahl temporary or permanent alimony.  Fourth, Ms. Dahl argues that the district court abused its discretion when it failed to divide the couple's marital assets evenly and equitably.  Fifth, Ms. Dahl asserts that the district court erred when it refused to allow Ms. Dahl to file an amended pleading in order to seek joint custody of the couple's children.  Finally, Ms. Dahl argues that the district court abused its discretion when it denied her motion for attorney fees.  For the reasons discussed below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

### A.  *Judge Taylor Was Not Subject to Disqualification*

¶44    On at least three occasions during the proceedings below, Ms. Dahl asserted that the district judge presiding over the divorce case, Judge Taylor, was biased against her and should be disqualified.  First, on November 26, 2007, Ms. Dahl filed a motion to disqualify Judge Taylor, arguing that his comments and actions during the course of the divorce proceedings created the "appearance of impropriety and partiality."  Specifically, Ms. Dahl alleged (1) that Judge Taylor had denied her equal access to the court by preferentially granting Dr. Dahl's motions while denying her motions and (2) that Judge Taylor had indicated bias against Ms. Dahl and her counsel when he made comments expressing annoyance with the lack of cooperation between the parties.  As required by rule 63 of the Utah Rules of Civil Procedure, Judge Taylor certified Ms. Dahl's motion to the presiding judge of the Fourth District, who denied the motion.

¶45    Second, on October 21, 2009, Judge Taylor disclosed to the parties that his wife was scheduled to undergo a surgical procedure

that would be performed by a cardiologist who was a member of the same medical group that employed Dr. Dahl. Ms. Dahl filed a notice indicating that she would not waive this potential conflict of interest. Even though Ms. Dahl had previously filed a rule 63 motion to disqualify, Judge Taylor submitted the question of the potential conflict to the presiding judge for review. *See* UTAH R. CIV. P. 63(b)(1)(C) ("No party may file more than one motion to disqualify in an action."). After considering affidavits submitted by the parties and conducting a telephone conference on the matter, the presiding judge determined that Judge Taylor need not be disqualified.

¶46   Finally, after the divorce trial concluded, Ms. Dahl argued that she should be granted a new trial because Judge Taylor was biased. Specifically, she alleged that she and Judge Taylor had interacted twenty years previously when she was a witness in a case in which Judge Taylor was serving as a prosecutor. She further alleged that Judge Taylor had inappropriately questioned her commitment to the LDS faith. With respect to the prior interaction, Ms. Dahl alleged that then-prosecutor Taylor became upset when Ms. Dahl suggested that the state prosecute LDS Church officials for failing to report a church member who had engaged in child molestation. Ms. Dahl maintains that Judge Taylor harbored ill will toward her on the basis of this previous interaction, which in turn caused him to question her commitment to the LDS faith during the divorce trial. Judge Taylor denied Ms. Dahl's motion for a new trial, indicating that he had no independent recollection of Ms. Dahl's involvement in the case decades prior.

¶47   On appeal, Ms. Dahl continues to assert that Judge Taylor was biased against her and therefore should have been disqualified (1) because he made negative comments about her and issued many rulings adverse to her, (2) because Judge Taylor's wife was scheduled to undergo surgery with a member of Dr. Dahl's medical group, and (3) because Judge Taylor was biased against her based on their interactions in the prior case. The question of disqualification due to judicial bias is a question of law that we review for correctness, giving no deference to the decision below. *State v. Alonzo*, 973 P.2d 975, 979 (Utah 1998). We find no basis for concluding that Judge Taylor should have been disqualified.

1. Adverse Rulings and Indications of Frustration Are Insufficient to Demonstrate Judicial Bias

¶48   Ms. Dahl asserts that an objective analysis of Judge Taylor's comments and rulings would lead a reasonable person to

question his impartiality and therefore Judge Taylor should have been disqualified. In support of her assertion, Ms. Dahl points to several adverse rulings Judge Taylor made against her and to Judge Taylor's statement that "Ms. Dahl and her counsel annoyed him." We are not persuaded that these instances suggest judicial bias and hold that Judge Taylor's adverse rulings and one-time statement of frustration are insufficient indications of partiality to require disqualification.

¶49 A judge should be disqualified when circumstances arise in which the judge's "impartiality might reasonably be questioned." *State v. Gardner*, 789 P.2d 273, 278 (Utah 1989). Judges are presumed to be qualified and a party alleging bias on the part of the judge has the burden of demonstrating that the judge is not qualified. *In re Affidavit of Bias*, 947 P.2d 1152, 1153 (Utah 1997) (Mem. of Zimmerman, C.J.); *see also* 46 Am. Jur. 2d *Judges* § 129 (2008) ("The law presumes that a judge is unbiased and unprejudiced."). Moreover, parties claiming bias must demonstrate that the alleged bias stems from an extrajudicial source. *State v. Munguia,* 2011 UT 5, ¶ 17, 253 P.3d 1082 ("In other words, the bias or prejudice must usually stem from an extrajudicial source, not from occurrences in the proceedings before the judge." (emphasis omitted) (internal quotation marks omitted)); *see also* 46 Am. Jur. 2d *Judges* § 131 (2008) ("[T]he alleged bias and prejudice of a judge must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his or her participation in the case . . . .").

¶50 In *State v. Munguia*, we were asked to determine whether a judge should have disqualified himself because of negative comments he made to the defendant in a criminal case. 2011 UT 5, ¶¶ 15–20. In that case, the judge challenged the defendant about whether he understood who was at fault or whether the defendant still thought his actions were a good experience for the victims. *Id.* Though we acknowledged that "we expect our judges to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others" with whom they interact in an official capacity, we nonetheless held that a judge's show of anger or frustration with a defendant, based on that defendant's behavior during the proceedings, was not grounds for disqualification. *Id.* ¶ 20 (internal quotation marks omitted).

¶51 In this case, Ms. Dahl claims that Judge Taylor was biased against her because he stated, "I am candidly annoyed that I'm

getting so many requests for review and objections . . . . It is counter-productive to getting this case resolved." On its face, this statement of frustration arose from the proceedings before Judge Taylor, not from some extrajudicial source. Furthermore, Judge Taylor directed his statement to all counsel at trial. He did not single out any particular litigant or counsel. On these facts, we find nothing suggesting judicial bias.

¶52 Ms. Dahl also contends that a reasonable person would question Judge Taylor's impartiality because of the number of rulings he made against her. This contention is wholly without merit. We have repeatedly held that adverse rulings alone are insufficient to establish the existence of judicial bias. *In re Affidavit of Bias*, 947 P.2d at 1154 ("[N]o deduction of bias and prejudice may be made from adverse rulings by a judge." (internal quotation marks omitted)); *In re Inquiry Concerning a Judge*, 2003 UT 35, ¶ 7, 81 P.3d 758 (per curiam) ("There is neither a factual nor a legal basis . . . for concluding that a judge who rules against a party on a particular legal issue is biased against that party."). To hold otherwise would expose judges to accusations of bias in every case because every case necessarily requires rulings adverse to one party or the other. We therefore hold that Judge Taylor was not subject to disqualification because there is no evidence in the record of extrajudicial bias.

2. The Scheduled Surgery of Judge Taylor's Wife Is Not a Sufficient Basis to Establish Judicial Bias

¶53 We next turn to Ms. Dahl's allegation that Judge Taylor should have been disqualified because his wife was scheduled to undergo cardiac surgery performed by another cardiologist in Dr. Dahl's medical practice group. During trial, Judge Taylor disclosed the upcoming surgery to the parties and requested that both parties consider waiving any potential conflict. Dr. Dahl agreed, but Ms. Dahl refused.

¶54 Ms. Dahl argues that she should have been allowed to file another formal motion to disqualify Judge Taylor but she was barred from doing so because she had previously filed such a motion. Rule 63 of the Utah Rules of Civil Procedure allows parties to move for disqualification of a judge, but it limits parties to one motion to disqualify in any action.[14] UTAH R. CIV. P. 63(b)(1)(C).

---

[14] In supplemental briefing, Ms. Dahl contends that rule 63 of the
(continued...)

This limitation, however, did not adversely affect Ms. Dahl because Judge Taylor nevertheless submitted the matter to the presiding judge for consideration, and the presiding judge determined that disqualification was not required. Ms. Dahl argues that this was error because there was a possibility that Dr. Dahl could have treated Judge Taylor's wife had he covered rotations for the other doctors in his practice. We find no error.

¶55 As we have discussed, a judge may be properly disqualified if a party demonstrates the existence of bias or prejudice stemming from an extrajudicial source, such as a social or professional relationship. *Munguia*, 2011 UT 5, ¶ 17. Ms. Dahl has identified a potential professional relationship. But a potential relationship is not enough. And to show an actual professional relationship, Ms. Dahl would have needed to establish that Dr. Dahl covered rotations for other doctors in the group and that those rotations could include treatment of Judge Taylor's wife.

¶56 Ms. Dahl did not meet her burden. Dr. Dahl submitted an affidavit in the district court testifying to the following: (1) Dr. Dahl does not know Judge Taylor's wife and has never seen her chart; (2) Judge Taylor's wife was not a patient of Dr. Dahl; (3) the doctors at Utah Central Clinic had their own patients and the patients of a particular doctor are not clients of the clinic; (4) the doctor performing the surgery on Judge Taylor's wife, Dr. Hwang, belonged to a separate group within the clinic and therefore Dr. Dahl had no financial ties with the surgery; and (5) Dr. Dahl is not on the Board of Directors of the clinic and has no say in the practices

---

[14](...continued)
Utah Rules of Civil Procedure limits a party's ability to ensure a fair trial. She argues that a judge would have "carte blanche to be biased once a rule 63 motion has been denied," because a party can file only one motion to disqualify a judge. We are not persuaded. A single motion to disqualify is sufficient in most cases and parties retain the ability to seek an extraordinary writ in cases where the application of the rule would create a substantial injustice. Ms. Dahl urges us to adopt a standard similar to that applied in the federal courts, in which a judge may be disqualified if there is conduct that manifests a "deep-seated favoritism or antagonism toward a party." However, the manifestation of bias alleged by Ms. Dahl would not establish judicial bias under that rule either, and we decline Ms. Dahl's invitation to adopt a new standard for judicial disqualification.

of other doctors in the clinic. In short, there was no possibility that Dr. Dahl could be involved in the treatment of Judge Taylor's wife or that he could financially benefit from that treatment. Because the only connection established by the evidence was that Dr. Dahl worked in the same building as another surgeon who would perform the surgery on Judge Taylor's wife, Judge Taylor was not subject to disqualification.

### 3. Judge Taylor's Interaction with Ms. Dahl Twenty-Three Years Previously Did Not Require Disqualification

¶57 Ms. Dahl's final alleged basis for judicial bias was an interaction she had with Judge Taylor twenty-three years previously in which he had allegedly criticized her religious devotion. According to Ms. Dahl, Judge Taylor, who was then a prosecutor, was involved in the prosecution of a man accused of sexually abusing children. Ms. Dahl was a witness for the prosecution at the sentencing hearing. The defendant had confessed to his church leaders, but the leaders had failed to report the abuse to legal authorities. Ms. Dahl alleges that when she requested that then-prosecutor Taylor prosecute the church leaders for failure to report, he compared her to a "son of perdition." Ms. Dahl asserts that Judge Taylor continued to harbor ill will toward her and improperly compared her and Dr. Dahl's religious devotion.

¶58 Ms. Dahl's claim is simply not supported by the evidence. In his order denying Ms. Dahl's motion for a new trial, Judge Taylor found:

> 1. The Court finds that with regard to [Ms. Dahl's] claims regarding the [prior] case, that the Court has no independent recollection of the case because as a prosecutor, the case was prosecuted 23 years ago.
>
> 2. The Court finds that it has no independent recollection of any involvement with Mrs. Dahl and in fact Mrs. Dahl apparently had a different name at the time.
>
> 3. The Court finds that the [prior] case was one that involved child abuse and that [defendant] plead guilty. The Court recalls that the case was appealed and that the result was achieved and affirmed. [Defendant] served a mandatory prison term.

4. The Court finds that it is not aware of what happened to [defendant] since the time frame set forth 23 years ago, except that [defendant] was sentenced to prison.

5. The Court finds that it does not even create an appearance of impropriety. The . . . case from 23 years ago has absolutely no involvement in this case and denies the Motion for a New Trial based upon that claim.

¶59 The fact that the events alleged by Ms. Dahl happened over twenty years ago, that Ms. Dahl went by a different name at the time, and that Judge Taylor had no independent recollection of the events described by Ms. Dahl is ample support for Judge Taylor's denial of the motion for disqualification.

¶60 Similarly, the record does not support Ms. Dahl's claim that Judge Taylor improperly compared her religious devotion to that of Dr. Dahl or that he criticized her for failure to adhere to the principles of the LDS faith. To support her claim, Ms. Dahl selectively cites the district court's Findings of Fact and Conclusions of Law. But the district court's findings and conclusions as a whole undermine her position. The court found:

> Although [Ms. Dahl] professed, during testimony, a commitment to the LDS religion, there was undisputed testimony that she has expressed frustration with the church to [her daughter, C.D.], and has acquiesced in [C.D.'s] decision to cease church activity. [Dr. Dahl] continues to attend with [D.D]. [D.D] was recently baptized. *It is not the place or intent of this Court to judge or compare the level of activity in a particular religion, except to the extent that disagreement on this point may impact the family.* The evidence does not demonstrate any disagreement or conduct that makes a meaningful difference in the family.

(Emphasis added). Despite the fact that the district court expressly declined to compare the religious activity of either party, Ms. Dahl still maintains that the court improperly compared her religious devotion to that of Dr. Dahl. But that suggestion is simply not supported by the facts. The court's observation of the parties' religious practices and its conclusion that those practices had no

24

bearing on its custody determination were not improper.[15] Ms. Dahl has therefore failed to demonstrate that disqualification was warranted.

¶61 In summary, Judge Taylor was not subject to disqualification in this case because Ms. Dahl has failed to demonstrate the existence of bias or prejudice stemming from an extrajudicial source.

### B. The District Court Did Not Abuse Its Discretion in Its Pretrial Evidentiary Rulings

¶62 Ms. Dahl next argues that the district court abused its discretion by (1) denying Ms. Dahl's motions to compel discovery, (2) excluding many of Ms. Dahl's proposed trial exhibits, and (3) limiting the testimony of two of Ms. Dahl's expert witnesses. We find no abuse of discretion. Rather, the rulings were appropriate because Ms. Dahl's counsel failed to comply with basic rules of procedure.

### 1. The District Court Did Not Abuse Its Discretion in Denying Ms. Dahl's Motions to Compel Discovery

¶63 Discovery in this case was highly acrimonious. The district court aptly described the discovery process as "a train wreck" in which it was forced to intervene on numerous occasions. As a general rule, we grant district courts a great deal of deference in matters of discovery and review discovery orders for abuse of discretion. *Green v. Louder*, 2001 UT 62, ¶ 37, 29 P.3d 638. Accordingly, we "will not find abuse of discretion absent an erroneous conclusion of law or where there is no evidentiary basis for the trial court's ruling." *Id.* (internal quotation marks omitted).

¶64 On appeal, Ms. Dahl argues that the district court abused its discretion in two ways. First, Ms. Dahl alleges that Dr. Dahl's responses to her requests for written discovery were deficient and that the district court should have granted her August 8, 2007 motion to compel further discovery. Second, Ms. Dahl argues that the district court should have compelled Dr. Dahl to supplement his discovery responses prior to trial so that she would not be forced to

---

[15] *See* UTAH R. JUD. ADMIN. 4-903(5)(E)(vi) (explaining that a custody evaluation must consider "religious compatibility with the child").

litigate her case with out-of-date information. We address each of Ms. Dahl's claims in turn.

### a. Ms. Dahl Has Not Adequately Briefed Her Argument that the District Court Should Have Granted Her Motion to Compel

¶65 The scheduling order adopted by the district court was drafted by Ms. Dahl's counsel. It set a deadline for fact discovery of September 1, 2007 and limited the parties to a total of twenty-five interrogatories, including subparts; four depositions for custody fact witnesses; and six depositions for financial fact witnesses. Ms. Dahl served her first and only set of interrogatories and requests for production of documents on June 1, 2007, just three months prior to the discovery deadline. According to Ms. Dahl, she never received a response from Dr. Dahl, prompting her to file her August 8, 2007 Motion to Compel Discovery Responses.

¶66 The commissioner considered Ms. Dahl's motion at a hearing on October 23, 2007. At that hearing, the commissioner ordered the parties to make their files available for opposing counsel to copy. On appeal, neither party's brief provides argument or citations to the record relating to this hearing. Instead, both parties' briefs refer to a July 17, 2007 hearing in which Ms. Dahl alleged that Dr. Dahl's discovery responses were deficient. But a review of the record reveals that the July 17, 2007 hearing actually involved two different motions to compel that had been filed against Marlette Enterprises and Dr. Charles M. Dahl, M.D. PC, Dr. Dahl's professional corporation. Indeed, there is no suggestion in the July 17 hearing that Ms. Dahl was complaining about the adequacy of the discovery responses filed by Dr. Dahl in his personal capacity. Ms. Dahl's challenge on appeal concerns only the August 8, 2007 motion to compel, which was filed against Dr. Dahl in his personal capacity. In short, the parties' briefing refers to a hearing on the wrong motions to compel and fails to direct the court to the portions of the record that address the challenged motion.

¶67 We have repeatedly stated that "[a]ppellate courts are not a depository in which [a party] may dump the burden of argument and research." *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 16, 309 P.3d 201 (alterations in original) (internal quotation marks omitted); *see also Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903. The record in this case spans over twelve thousand pages. Ms. Dahl, as the appellant, bears the burden of directing our attention to those portions of the record that support her claim that the district court abused its discretion when it denied her motion to compel discovery.

*See* UTAH R. APP. P. 24(a)(9) (requiring citations to "parts of the record relied on"); *ASC Utah*, 2013 UT 24, ¶ 16. Even if Dr. Dahl's discovery responses were unsatisfactory, we cannot conclude that the district court abused its discretion based on Ms. Dahl's briefing, and we decline to undertake the gargantuan task of sifting through the record in this case to make Ms. Dahl's argument for her.

> b. The District Court Did Not Abuse Its Discretion When It Denied Ms. Dahl's Motion to Compel Supplementation of Discovery

¶68 Ms. Dahl's second claim of error is that the district court abused its discretion when it denied her motion to compel Dr. Dahl to supplement his discovery responses prior to trial. On July 31, 2009, Ms. Dahl filed a Motion to Compel Supplementation of Discovery Requests. In her supporting memorandum, Ms. Dahl argued that Dr. Dahl's responses to her June 1, 2007 discovery requests were incomplete. Ms. Dahl also argued that Dr. Dahl had failed to supplement his discovery responses since December 19, 2007, when he first responded to her initial discovery requests.

¶69 Relying on rule 26(e) of the Utah Rules of Civil Procedure, Ms. Dahl argued in the trial court that Dr. Dahl had an ongoing duty to supplement his discovery requests. Rule 26(e)[16] requires parties to supplement any disclosures or responses if two conditions are met. First, a party must supplement if the party learns that the information disclosed in its initial disclosures or in response to prior interrogatories, requests for production, or requests for admission "is in some material respect incomplete or incorrect." UTAH R. CIV. P. 26(e)(1)–(2) (2009). Second, this duty to supplement arises only if the corrective information has not already been made known to the other parties. *Id.* The district court denied Ms. Dahl's motion to compel supplementation because it was filed "too late" and because it was "not specifically focused enough to be characterized as supplementation." We agree.

¶70 As the district court noted in its September 15, 2009 hearing on the matter, Ms. Dahl did not notify Dr. Dahl that she considered his discovery requests to be deficient until July 21, 2009. The court specifically noted that Ms. Dahl's counsel had received Dr. Dahl's

---

[16] Rule 26(e) has been redesignated as rule 26(d) in the current Utah Rules of Civil Procedure. We will refer to the 2009 version of the rules since those rules governed this case.

discovery responses in December 2007, but waited until July 2009—less than two months before the September 2009 trial date—to request supplementation or to challenge the sufficiency of the responses. And counsel offered no explanation for the long delay. We cannot conclude that the district court abused its discretion when it found that Ms. Dahl's motion was "too little too late."

¶71   Moreover, rule 26 does not require a wholesale update to every discovery response. Parties must supplement only if they discover their initial responses were incomplete or incorrect in some important way *and* that the corrective information was not already known to the other party. Dr. Dahl claims that all documentation was produced as required, either through his initial discovery responses or through responses to various subpoenas. And Ms. Dahl has not identified any specific documents introduced at trial demonstrating that Dr. Dahl's initial responses were incomplete or that counsel did not have the appropriate corrective information. Instead, she makes only generalized allegations that the information was "out of date" by the time of trial. On these facts and this briefing, we cannot conclude that the district court abused its discretion. Accordingly, we affirm.

2. The District Court Did Not Abuse Its Discretion When It Limited the Number of Exhibits Ms. Dahl Was Allowed to Introduce at Trial

¶72   At a June 17, 2009 pretrial conference, the district court ordered the parties to exchange "an actual schedule of the people [they planned] to call and the exhibits [they planned] to use" no later than two weeks before the first day of trial. The court explained that the parties were to "carefully contemplate who they [were] actually going to call" and cautioned the parties against simply listing multitudes of potential witnesses. The court also repeatedly emphasized that the parties were to exchange the "actual exhibits" they planned to use at trial.

¶73   The exhibit list submitted by Ms. Dahl's counsel failed to comply with the court's order. Nor did it comport with any reasonable standards of pretrial disclosure. The exhibit list encompassed the entire universe of potential exhibits and was accompanied by a CD containing digital copies of over 8,000 documents. For example, the first exhibit listed was "[a]ny and all documents exchanged by the parties as potential exhibits in this matter on August 31, 2009, to the extent that they are admissible." Other listed exhibits included "[a]ny and all documents maintained in the Court's file"; "[a]ll affidavits filed in this matter"; "[a]ll email

28

communications and other written communications between the parties"; "[a]ny and all admissible information, received pursuant to Subpoena Duces Tecum or other discovery method in the above-entitled matter"; and "[a]ny rebuttal exhibits." The list was so broad and overinclusive as to be meaningless. It failed to identify any particular exhibit by an identifying number or a particularized description and made no effort to link the general categories of documents to the electronic documents contained on the CD. In short, the exhibit list failed to identify any single document with enough particularity to allow the court or opposing counsel to identify it as one Ms. Dahl planned to introduce at trial.

¶74 At the final pretrial motion hearing on September 15, 2009, the court considered Dr. Dahl's objections to Ms. Dahl's exhibit list. The court noted the problems with the exhibit list, stating:

> I thought my direction to you was clear. It's the same direction I give to every litigant who prepares for trial. I tell them to prepare a list of the actual exhibits, one by one that they intend to introduce and you've given me a list that says all the documents maintained, all the affidavits, all the records relied upon, all the marital communications. That's completely unworkable. I'm not going to allow you to simply dump all your discovery on my desk and tell me to sort it out.

¶75 The court thereafter struck the exhibit list and ordered counsel to resubmit a list that would identify particular documents that he would use with particular witnesses. In response, Ms. Dahl's counsel filed an amended exhibit list on September 22, 2009, the first day of trial.[17] The amended list, though improved, continued to include designations such as "[a]ny and all documents exchanged by the parties as potential exhibits in this matter on August 31, 2009, to the extent they are admissible." The court again expressed its displeasure at counsel's failure to specifically identify which exhibits he planned to use at trial, citing the need to give all parties fair notice. But the court reserved its ruling on the amended exhibit list until the next scheduled trial day.

---

[17] The trial was conducted over fourteen nonconsecutive days between September and November 2009.

¶76   On the next trial date, the court noted that counsel for Ms. Dahl had yet to submit an acceptable witness or exhibit list.  By October 7, the fifth day of trial, counsel continued to attempt to introduce exhibits that had not previously been disclosed to the court or opposing counsel.  The district court properly refused to allow these exhibits.  On October 23 and November 4, counsel for Ms. Dahl filed supplemental exhibit lists, which identified particular documents, but did not identify which witness would be used to introduce the documents.  Because Ms. Dahl's counsel failed to submit a proper exhibit list, the district court was confronted with the daunting task of determining, on a document-by-document basis during the course of trial, which exhibits had been previously produced.  If a document had been previously produced to opposing counsel, the trial court admitted it.  If not, the court excluded it.

¶77   Ms. Dahl argues that the district court abused its discretion when it excluded most of her exhibits based on counsel's failure to submit a proper exhibit list.  Specifically, Ms. Dahl argues that the district court's pretrial order requiring that the parties exchange witness lists and exhibits was unclear because it did not specify a particular format for the lists.  We disagree.  The district court's order clearly directed the parties to designate particular documents to be used with particular witnesses and to exchange those documents with opposing counsel.  And even if the district court's order were unclear, counsel was given numerous opportunities to rectify the situation and failed to do so.  The district court would have been justified in refusing to exclude all of Ms. Dahl's exhibits based on her failure to submit a proper exhibit list prior to the start of trial.  And it appropriately exercised its discretion when it excluded all documents except those that the parties stipulated had been previously disclosed during discovery.

3. The District Court Did Not Abuse Its Discretion When It Limited the Testimony of Ms. Dahl's Expert Witnesses

¶78   Ms. Dahl argues that the district court abused its discretion when it limited the testimony of two of her expert witnesses, Dr. Barden and Dr. Mejia.  Ms. Dahl timely designated Drs. Barden and Mejia as experts prior to trial.[18]  Although the district court allowed

---

[18] Ms. Dahl also designated two other expert witnesses, Mr. Thayer and Mr. Brough.  Although the district court also excluded

(continued...)

these two experts to testify, it limited the scope of their testimony to the reports and affidavits the experts had filed earlier in the litigation. Ms. Dahl asserts that this limitation was an abuse of discretion. We disagree.

¶79 Rule 26(a)(3) of the Utah Rules of Civil Procedure governs expert testimony.[19] For each expert witness whom a party expects to testify, the party is required to submit a written report prepared by the expert. UTAH R. CIV. P. 26(a)(3)(B) (2009). In relevant part, the rule requires:

> The report shall contain the subject matter on which the expert is expected to testify; the substance of the facts and opinions to which the expert is expected to testify; a summary of the grounds for each opinion; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

*Id.* Though counsel for Ms. Dahl filed what were styled as expert witness reports for Drs. Barden and Mejia, neither report complied with the requirements of rule 26.

¶80 The expert report for Dr. Barden consisted of a mere four pages, contained no summary of Dr. Barden's qualifications or list of his publications, and identified the proposed subject matter of his testimony only in the most cursory way. For example, Dr. Barden's expert report proposed that he would "testify regarding the importance of proper methodology and responsible behavior in child custody investigations, evaluations, and litigation." As grounds for Dr. Barden's opinion, the report cited Dr. Barden's "education, knowledge, training, and experience in the fields of clinical, child-clinical, and forensic psychology." As the district court noted, the expert report was "far less than adequate" to inform

---

[18](...continued)
their testimony, Ms. Dahl does not challenge that ruling on appeal.

[19] In 2012, rule 26(a)(3) was redesignated as rule 26(a)(4) in the current Utah Rules of Civil Procedure. For consistency, we refer to the 2009 version throughout.

the court or opposing parties as to the scope and content of Dr. Barden's testimony.

¶81    The expert report for Dr. Mejia was similarly deficient. The report was less than two pages and contained only vague descriptions of Dr. Mejia's proposed testimony. The report failed to include a list of Dr. Mejia's publications or of previous cases in which he had testified.

¶82    Despite these shortcomings, the district court allowed Drs. Mejia and Barden to testify, but limited their testimony to that consistent with reports they had filed previously in the litigation. Given Ms. Dahl's failure to provide the kind of proper notice of expert testimony contemplated by rule 26, the district court did not abuse its discretion in limiting these experts' testimony in this way.

¶83    Pretrial discovery and disclosure are basic skills that we expect all attorneys to possess. Our already overworked district court judges should not be required to provide remedial instructions to counsel on how to properly conduct discovery, designate trial exhibits, or prepare expert reports. Our courts rely heavily on the competence and diligence of counsel. The evidentiary rulings Ms. Dahl complains of were largely the result of her counsel's inability to follow basic rules of procedure and properly manage discovery. Accordingly, we conclude that the district court did not abuse its discretion in its pretrial evidentiary rulings.

C.    *The District Court Did Not Abuse Its Discretion in Denying Ms. Dahl's Requests for Both Temporary and Permanent Alimony*

¶84    Ms. Dahl next challenges the district court's denial of her requests for temporary and permanent alimony. We review a district court's alimony determination for an abuse of discretion and "will not disturb [its] ruling on alimony as long as the court exercises its discretion within the bounds and under the standards we have set and has supported its decision with adequate findings and conclusions." *Connell v. Connell*, 2010 UT App 139, ¶ 5, 233 P.3d 836 (internal quotation marks omitted). We conclude that although Ms. Dahl may have qualified for an award of both temporary and permanent alimony, the district court did not abuse its discretion in refusing to make such an award because Ms. Dahl's counsel repeatedly failed to provide the credible financial documentation necessary for the district court to make an adequate finding as to Ms. Dahl's financial need.

1. The District Court Did Not Abuse Its Discretion in Denying Ms. Dahl's Request for Temporary Alimony

¶85    Ms. Dahl made several requests for temporary alimony in the years between the initial divorce filing and the trial.  In a motion for order to show cause filed shortly after Dr. Dahl petitioned for divorce, Ms. Dahl moved the court for an order to show why, among other requests, "[Dr. Dahl] should not be ordered to pay temporary alimony in the amount of $9,300 per month."  Ms. Dahl attached as an exhibit to her motion a list of her alleged monthly living expenses, which totaled just over $11,000. But Ms. Dahl failed to include any financial documentation to substantiate these alleged expenses.  In his response to Ms. Dahl's motion, Dr. Dahl refuted nearly every expense and instead argued that reasonable living expenses for Ms. Dahl would total approximately $6,000 per month.

¶86    At the hearing on Ms. Dahl's first request for temporary alimony, the commissioner determined that Ms. Dahl's declaration was not sufficiently detailed and did not have enough evidentiary support for him to comply with the rules, statutes, and case law governing alimony awards.  The commissioner also found that Ms. Dahl's alleged $11,000 in monthly expenses had been "based on the assumption that she would be awarded custody of the minor children."  Because Dr. Dahl had since been awarded temporary custody of the children, the commissioner found that Ms. Dahl's expenses, "were no longer relevant to the temporary circumstances of the parties."  Citing to *Whitehead v. Whitehead*, 836 P.2d 814 (Utah Ct. App. 1992), *superseded by statute on other grounds*, UTAH CODE § 78B-12-112, and to rule 101 of the Utah Rules of Civil Procedure, the commissioner held that "the Court is unable to consider [Ms. Dahl's] requests . . . based on the inadequate information [she] provided to the Court."

¶87    Two months later, Ms. Dahl filed an affidavit in support of her request for temporary alimony.  The affidavit, however, did not include any verification of the expenses she claimed, nor did it include any verification of her current financial condition or need. Instead, Ms. Dahl attached a 2005 tax return and an appraisal of the marital home in which she was no longer living.  The commissioner again found the evidence insufficient to support an alimony award and ordered Ms. Dahl to file a financial declaration that complied with rule 101(d) of the Utah Rules of Civil Procedure.

¶88    A third hearing on this issue was held, but Ms. Dahl had not yet complied with the court's prior order that she provide a

financial declaration. The commissioner again, relying on the Rules of Civil Procedure, the Utah Code, and relevant case law, declined to award temporary alimony. The matter was then raised in the district court at a hearing just four days later. The district court ordered Ms. Dahl to comply with the commissioner's order for a financial declaration.

¶89 Ms. Dahl made a third attempt at documenting her financial need a month and a half later when she filed a "Verified Financial Declaration." In contrast to her first declaration, where she testified to just over $11,000 in monthly expenses, she testified to over $40,000 in monthly expenses in addition to $281,428.62 in legal fees and an additional $148,000 in projected fees. But Ms. Dahl again failed to provide verification of any of these expenses. She provided no proof of income, no bills, no checks, no lease agreement, no bank statements. In short, she provided absolutely no evidence to support the claimed expenses. The commissioner again ruled that Ms. Dahl had failed to provide sufficient evidence to support an alimony award under Utah law. Specifically, he stated that he was unable to make the necessary factual findings due to a lack of credible evidence. When the district court reviewed and ruled on the commissioner's recommendation, Ms. Dahl had still not complied with the commissioner's order for a financial declaration, and the district court therefore adopted the commissioner's findings. The district court expressed dismay with the fact that Ms. Dahl had originally attested to $11,000 in monthly expenses for herself and her two children and had subsequently attested to $40,000 in monthly expenses for herself alone. The district court found that "those two amounts [could not] be reconciled" and that Ms. Dahl's financial declaration was therefore not credible. Thus the court declined to award Ms. Dahl temporary alimony.

¶90 Nearly a year after the divorce petition had been filed, Ms. Dahl filed another motion for temporary alimony, accompanied by a new affidavit. In this affidavit, Ms. Dahl claimed expenses of $33,166 per month. Again, there was no supporting documentation for this amount. One day prior to the hearing on the motion, Ms. Dahl submitted a notice of errata to her affidavit, which finally, after a year of litigation, included a copy of a rent check, other checks written for unknown purposes, utility bills, and past-due medical bills. These bills totaled $2,651.78.

¶91 At the hearing the next day, the commissioner treated this second motion for temporary alimony as a motion to reconsider the

court's prior rulings that no temporary alimony was warranted. The commissioner denied Ms. Dahl's motion to reconsider, reasoning that Ms. Dahl had been given ample opportunity to file an acceptable affidavit (one year of discovery and at least five hearings), and that the court's prior ruling denying temporary alimony was now the law of the case.

¶92 The district court ultimately adopted the commissioner's recommendation on the alimony issue. The district court found that "[Ms. Dahl's] [c]ounsel was previously permitted to re-file this Motion several times" but each time had failed to include the necessary supporting documents. The court therefore ruled that Ms. Dahl "had failed to meet her burden of proof" and again denied her request for temporary alimony. Although the court never granted Ms. Dahl an official award of temporary alimony, she was awarded a small number of one-time payments totaling $19,000, and Dr. Dahl voluntarily gave Ms. Dahl $4,000 a month throughout the entire course of the divorce proceedings. In total, Ms. Dahl received $162,000 from Dr. Dahl while the divorce was pending.

¶93 On appeal, Ms. Dahl argues that the district court abused its discretion in failing to award her temporary alimony. According to Ms. Dahl, she demonstrated her need for alimony during the pendency of the divorce proceedings. Alternatively, she argues that Dr. Dahl's financial declarations were sufficient to demonstrate her need. Specifically, she asserts that she provided the court with "at least five financial declarations, along with several other filings supporting her need for alimony, providing copies of her verified statements of income and expenses."

¶94 The Utah Alimony Statute, UTAH CODE § 30-3-5(8), articulates seven factors that a court must consider in making an alimony determination:

> (i) the financial condition and needs of the recipient spouse;
> (ii) the recipient's earning capacity or ability to produce income;
> (iii) the ability of the payor spouse to provide support;
> (iv) the length of the marriage;
> (v) whether the recipient spouse has custody of minor children requiring support;
> (vi) whether the recipient spouse worked in a business owned or operated by the payor spouse; and
> (vii) whether the recipient spouse directly contributed

to any increase in the payor spouse's skill by paying for education received by the payor spouse or enabling the payor spouse to attend school during the marriage.

UTAH CODE § 30-3-5(8)(a).

¶95   The first three factors are a codification of our analysis in *Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985), and are often referred to as the *Jones* factors.  A party seeking alimony bears the burden of demonstrating to the court that the *Jones* factors support an award of alimony. *See Whitehead*, 836 P.2d at 817 (affirming a district court's decision to deny an award of alimony where the recipient spouse "failed to prove her financial needs"); *see also Broemer v. Broemer*, 109 So. 3d 284, 288 (Fla. Dist. Ct. App. 2013) (explaining that where former wife sought an award of alimony, she had "the burden to prove her actual need and the former husband's ability to pay alimony"); *Hagedorn v. Hagedorn*, 822 N.W.2d 719, 722 (S.D. 2012) (holding that "[t]he party requesting alimony has the burden to establish that they have a need for support and that their spouse has sufficient means and abilities to provide for part or all of that need" (internal quotation marks omitted)); *In re Marriage of Robert*, 820 N.W.2d 158 (Iowa Ct. App. 2012) (collecting cases from various jurisdictions that have held that "the party seeking spousal support bears the burden of proof").

¶96   To satisfy this burden, a party seeking alimony must provide the court with a credible financial declaration and financial documentation to demonstrate that the *Jones* factors support an award of alimony. *Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 9, 80 P.3d 153 (explaining that before awarding alimony, "the trial court is required to make adequate factual findings on all material issues, unless the facts in the record are clear, uncontroverted, and capable of supporting only a finding in favor of the judgment" (internal quotation marks omitted)); *see also* UTAH R. CIV. P. 101(d)(1) ("Attachments for motions and responses regarding alimony shall include income verification and a financial declaration.").[20]  Failure

---

[20] We note that the type of financial documentation that the district court ordered Ms. Dahl to provide is now automatically required under rule 26.1 of the Utah Rules of Civil Procedure. Indeed, rule 26.1 provides a detailed list of the documents that

(continued...)

to consider the *Jones* factors when determining an appropriate alimony award "constitutes an abuse of discretion." *Paffel v. Paffel*, 732 P.2d 96, 101 (Utah 1986). But where a party seeking alimony fails to satisfy its burden, a district court will generally not abuse its discretion in declining to award alimony.

¶97   For example, in *Whitehead*, the court of appeals affirmed a district court's decision to deny a request for alimony where the recipient spouse "failed to provide evidence of her needs" and where her alleged monthly living expenses were "unsubstantiated." 836 P.2d at 817. And in *Bakanowski*, the court of appeals reversed a trial court's decision to award alimony, holding that "[t]he trial court abused its discretion by failing to make adequate findings in awarding alimony." 2003 UT App 357, ¶ 17; *see also Bell v. Bell*, 810 P.2d 489, 492 (Utah Ct. App. 1991) ("[T]he trial court must make sufficiently detailed findings of fact on each [*Jones*] factor to enable a reviewing court to ensure that the trial court's discretionary determination was rationally based upon these three factors.").

¶98   In this case, although Dr. Dahl submitted sufficient evidence to the court to demonstrate his ability to pay alimony, Ms. Dahl's counsel repeatedly failed to comply with the district court's order to supply the court with documentation demonstrating the remaining two *Jones* factors—Ms. Dahl's financial need and earning capacity. When the commissioner denied Ms. Dahl's initial request for $11,000 per month in temporary alimony, he indicated that he would reconsider the request if Ms. Dahl would provide credible documentation of her financial need. Instead of supplying the court with the requested documentation, Ms. Dahl submitted a new declaration, requesting over $40,000 in monthly alimony. The commissioner and district court found this amount even less credible. And because Ms. Dahl's counsel again provided no evidence to substantiate Ms. Dahl's alleged monthly expenses or earning ability, the district court appropriately denied her request

---

[20](...continued)
parties to a divorce must include in their financial declarations. While this rule was not in place at the time of the Dahls' divorce litigation and is thus not controlling in this matter, the fact that detailed financial documentation is now automatically required supports the notion that the district court did not abuse its discretion in ordering such documentation in this case.

for temporary alimony. We therefore affirm the district court on this issue.

## 2. The District Court Did Not Abuse Its Discretion in Denying Ms. Dahl's Request for Permanent Alimony

¶99   Ms. Dahl next argues that, even if she failed to establish her financial need prior to trial, her trial testimony was sufficient to demonstrate a need for permanent alimony. Thus, she asserts that the district court abused its discretion when it denied her request for permanent alimony.  We disagree.

¶100 As outlined above, Ms. Dahl failed to comply with the district court's order that she provide credible evidence of her financial need prior to trial. By the time of trial—after nearly three years of litigation—Ms. Dahl's counsel had still not filed an acceptable financial declaration.  This fact was brought to the district court's attention when Dr. Dahl's counsel noted that Ms. Dahl had not included a financial declaration in her trial exhibit list.  When the district court asked Ms. Dahl's counsel about this apparent oversight, counsel responded that Ms. Dahl would be relying on financial information she had presented over two years earlier, the same information that the court had already ruled to be insufficient.

¶101 True to her counsel's word, Ms. Dahl's trial testimony mirrored her previously filed financial declarations in that it was devoid of supporting evidence.  Although Ms. Dahl attempted to admit into evidence a summary of the Dahls' living expenses, the district court sustained Dr. Dahl's objection to its admission because Ms. Dahl's counsel had not disclosed the document prior to trial.  And Ms. Dahl failed to introduce any supporting evidence such as third-party testimony, bank statements, or bills to support her request. Instead, she relied solely on her recollection of her spending habits, current expenses, and her ability to work.[21]

---

[21] Ms. Dahl testified that although she held undergraduate and graduate degrees and had been employed as a high school counselor prior to her marriage, she was unable to work in her prior profession because she had a number of medical problems, including Crohn's disease, ulcerative colitis, and interstitial cystitis. With respect to her spending during the marriage, she testified that she had the following monthly expenses: $500 for handyman services; $2,500 for yard and pool maintenance; $2,000 for upkeep of the marital home;

(continued...)

¶102 In contrast, when Dr. Dahl testified as to his income and expenses, he presented a financial declaration that had been produced as part of his pretrial disclosures and that was supported with financial documents such as bank and credit card statements, tax returns, and bills.

¶103 In its Findings of Fact and Conclusions of Law, the district court made specific findings with regard to each of the factors listed in the Alimony Statute. It first found that Ms. Dahl presented no credible testimony to establish her current financial need. In comparing Ms. Dahl's testimony with that of Dr. Dahl, the district court found that while Dr. Dahl "based his testimony about family expenses upon a study of the accounts used to make the payments," Ms. Dahl's testimony "was based upon a general impression or estimate," which was "consistent with her characterization of herself as having an unlimited budget." Therefore, while the court found Ms. Dahl's testimony incredible and unsubstantiated, it found Dr. Dahl's testimony "credible and not rebutted by other competent evidence."

¶104 As to the second alimony factor, the district court found that Ms. Dahl was not employable in her prior occupation or as an interior designer, but found that "[w]hether she is capable of other employment was not addressed in the evidence." And in assessing Dr. Dahl's ability to provide support, the court found he was capable of paying $9,193 per month in alimony.

¶105 As to the remaining statutory factors, the court found that the parties had been married for seventeen years and seven months, that Ms. Dahl would not have custody of the parties' minor children, that Ms. Dahl worked as a school counselor from 1985 to 1992 but had not worked outside of the home since, and that "there [was] no

---

[21](...continued)
$400 for gifts; $5,300 for clothes and food; $1,000 for entertainment; $1,500 to $2,000 for travel; $900 for automobile maintenance ; another $500 for clothes; $400–$500 for Costco; and $200–$300 for department store cards. As to her ongoing expenses, Ms. Dahl testified that a home equivalent to the marital home would cost $8,000 a month to rent and that she required thousands of dollars for medical expenses, $4,400 for health insurance, $200 for TV and Internet, and $500 for maintenance of a cabin at Timber Lake. But she provided no documentation to substantiate these alleged expenses.

evidence that [Ms. Dahl] contributed to [Dr. Dahl's] professional ability or skill or that she in any way contributed to the cost of his education."

¶106  Upon applying the relevant law to these factual findings, the district court concluded that Ms. Dahl "failed to meet her burden to establish a basis for a claim for spousal support."  Because Ms. Dahl did not provide a credible account of her current financial need as required by the Alimony Statute, the court found it "impossible . . . to determine what level of spouse support is presently necessary to result in a standard of living at present that would approach the previous living condition."  The court thus held that by "adopt[ing] the trial tactic of relying solely upon [Ms. Dahl's] estimate of expenses from the period of marital cohabitation rather than providing realistic testimony about her current assets, needs and expenses," Ms. Dahl had precluded the court from considering an award of alimony.

¶107  On appeal, Ms. Dahl argues that the district court abused its discretion in failing to award her permanent alimony. Specifically, she alleges that (1) she presented the evidence necessary to demonstrate her need for alimony, (2) the court failed to make the necessary factual findings, (3) the court failed to specify the time period it used to make its alimony determination, and (4) the court's decision to deny permanent alimony created a substantial inequality. We address each argument in turn.

a.  Ms. Dahl Did Not Satisfy Her Burden of Showing Her Financial Need

¶108  As the party seeking an award of permanent alimony, Ms. Dahl bore the burden of providing the district court with sufficient credible evidence of each factor listed in the Alimony Statute.  Ms. Dahl argues that she "showed that she had expenses and had the need for an award of alimony" and that her testimony was credible. But as explained above, Ms. Dahl's testimony consisted solely of her recollection of her marital expenses.  She provided no financial declaration, no supporting financial documentation, and no expert testimony. Nor did she provide testimony about whether she had any nonmarital property or assets.  Ms. Dahl's unsubstantiated testimony did not satisfy her burden of showing her financial need.

¶109  Alternatively, Ms. Dahl argues that even if the district court correctly determined that she failed to establish her financial need, she should be relieved from this burden because she did not have

access to the marital records. This argument, however, is unsupported by the record, which demonstrates that Ms. Dahl had over a year of discovery, during which time her counsel issued hundreds of subpoenas to financial institutions to obtain documentary evidence of the Dahls' finances. In fact, Ms. Dahl's own financial expert, Mr. Brough, submitted an affidavit to the court over two and a half years prior to trial wherein he stated that he saw over 20,000 documents from these financial institutions and opined that thousands more would be produced during discovery. In short, Ms. Dahl's argument that she was denied access to the marital records is without merit. We therefore conclude that Ms. Dahl failed to meet her burden of showing her financial need—a necessary prerequisite to an award of permanent alimony.

b. The District Court Made Sufficient Findings as to Each Statutory Alimony Factor

¶110 Ms. Dahl also argues that the district court failed to make the necessary factual findings to support its refusal to order alimony. Specifically, she asserts that the district court failed to consider the length of the parties' marriage. But this argument is completely unsupported by the record. In the district court's findings of fact and conclusions of law, the court explicitly acknowledged the length of the marriage in its discussion of alimony. The district court also made specific factual findings with regard to the other six statutory alimony factors. Contrary to Ms. Dahl's assertion, the district court's decision to deny Ms. Dahl's alimony request was not the result of a failure to consider the necessary factors. Instead, the court was hampered primarily by Ms. Dahl's failure to provide the court with any credible evidence regarding her financial need. We therefore hold that the district court made the factual findings necessary to support its ruling.

c. The District Court Properly Required Evidence of Current Financial Need in Addition to Evidence of Ms. Dahl's Prior Standard of Living

¶111 Ms. Dahl next argues that the district court improperly required evidence of her current financial need rather than relying solely on evidence of her standard of living during the marriage. As Ms. Dahl correctly points out, the primary purpose of alimony is "to enable the receiving spouse to maintain *as nearly as possible* the standard of living enjoyed during the marriage and to prevent the spouse from becoming a public charge." *Connell v. Connell*, 2010 UT App 139, ¶ 9, 233 P.3d 836 (emphasis added) (internal quotation

marks omitted). And while the Alimony Statute instructs courts to "look to the standard of living, existing at the time of separation, in determining alimony," it also explains that a district court "shall consider *all relevant facts and equitable principles* and may, in its discretion, base alimony on the standard of living that existed at the time of trial." UTAH CODE § 30-3-5(8)(e) (emphasis added). Therefore, while an alimony award would ideally allow both spouses to maintain the standard of living enjoyed during the marriage, the court is nevertheless obligated to support any alimony award with specific factual findings as to each statutory factor and is permitted to deviate from the general rule in light of the relevant facts and equities.

¶112 Contrary to Ms. Dahl's assertion, the district court in this case did look to Ms. Dahl's standard of living during the marriage, but concluded that because Ms. Dahl had failed to satisfy her burden of showing her present need, it was "impossible" to determine the amount of alimony "necessary to result in a standard of living at present that would approach the previous living condition." And, as discussed below, where Ms. Dahl provided no evidence to the court to suggest that her substantial property award would not be sufficient to maintain a standard of living similar to that which she enjoyed during the marriage, the district court did not abuse its discretion in declining to award Ms. Dahl permanent alimony.

d. Because Ms. Dahl Received a Sizeable Property Award, the District Court Did Not Create a Substantial Inequality in Denying Ms. Dahl's Request for Permanent Alimony

¶113 Ms. Dahl argues that the district court created a substantial inequality when it failed to award her permanent alimony, even though it concluded that Dr. Dahl was capable of paying up to $9,139 per month. Specifically, she contends that without an award of permanent alimony, Dr. Dahl will be able to continue to "live[] in luxury," while Ms. Dahl will live "as a pauper with no income and a marital property award insufficient to pay even her current obligations."

¶114 In *Bakanowski*, the court of appeals explained that if a district court considers each of the statutory alimony factors, "we will not disturb its award absent a showing that *such a serious inequity has resulted* as to manifest a clear abuse of discretion." 2003 UT App 357, ¶ 10, (emphasis added) (internal quotation marks omitted). In that case, the district court awarded Ms. Bakanowski $1,000 per month in permanent alimony. *Id.* ¶ 5. The court of

appeals reversed the alimony award, concluding that the district court had "fail[ed] to enter specific findings on [Ms. Bakanowski's] financial needs and condition, and the pertinent facts in the record [were] not clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Id.* ¶ 11 (internal quotation marks omitted). The court of appeals held that it was error for the court to award alimony in an effort to "simply equalize income" without considering each of the statutory alimony factors. *Id.* ¶ 12.

¶115 Here, Ms. Dahl asks us to order the same type of income equalization that the court of appeals rejected in *Bakanowski*. Although the district court in this case attempted to evaluate each statutory alimony factor, it was prevented from making all the necessary factual findings due to Ms. Dahl's failure to provide credible evidence of her financial need. And without such evidence, any alimony award would have been merely an attempt to equalize income.

¶116 In divorce cases where there is insufficient evidence of one of the statutory alimony factors, courts may impute figures. *See, e.g., Connell*, 2010 UT App 139, ¶¶ 14–20 (imputing husband's income from a prior job to determine his ability to pay alimony); *Leppert v. Leppert*, 2009 UT App 10, ¶ 12, 200 P.3d 223 (holding that the district court did not abuse its discretion in imputing an income figure for wife when the decision was "adequately supported" by the district court's findings). In this case, the district court could have similarly imputed a figure to determine Ms. Dahl's financial need based either on Dr. Dahl's records of the parties' predivorce expenses or a reasonable estimate of Ms. Dahl's needs. But it was not required to do so because Ms. Dahl received a sufficiently large property award to support a comfortable standard of living. The district court awarded Ms. Dahl over $1.5 million in marital property. In light of this award, it was unnecessary for the district court to impute a figure for Ms. Dahl's need. And while it may be true that Ms. Dahl's award was "insufficient to pay even her current obligations," the obligations referred to consist largely of her attorney fees,[22] which, as explained below, we conclude are unreasonable. Indeed, but for her unreasonably high attorney fees, Ms. Dahl's property award was

---

[22] As the district court explained, Ms. Dahl's attorney fees constituted "[b]y far the largest debt identified in these proceedings, the sheer size of the claim threatens to swallow the entire marital estate."

sufficiently large to prevent any "serious inequity" arising from the district court's refusal to award permanent alimony.

¶117   In summary, we hold that the district court acted within its discretion in denying Ms. Dahl's request for permanent alimony. Ms. Dahl failed to provide the court with the evidence necessary to demonstrate her financial need.  The record clearly indicates that the district court was mindful of the statutory alimony factors and made all of the findings it could based on the evidence before it.  Any harm Ms. Dahl may have suffered by receiving no permanent alimony was not a result of error on the part of the district court, but instead was due to her counsel's failure to present the evidence necessary to support an award of permanent alimony.[23]  We therefore affirm the district court's decision denying Ms. Dahl's request for permanent alimony.

### D.  The District Court Erred in Part in Its Division of the Marital Assets

¶118 Ms. Dahl next argues that the district court abused its discretion in dividing the marital assets by (1) failing to make adequate findings of fact to support its distribution determination, (2) distributing the liquid assets inequitably, (3) concluding that Dr. Dahl's IRA accounts were not marital property, (4) finding that certain real property subject to a series of exchanges pursuant to 26 U.S.C. § 1031 was separate property, and (5) failing to consider commingling of marital assets with Dr. Dahl's premarital pension plan.  For the reasons discussed below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶119 Generally, district courts have considerable discretion concerning property distribution in a divorce proceeding and their determinations "enjoy a presumption of validity." *Elman v. Elman,* 2002 UT App 83, ¶ 17, 45 P.3d 176.  Thus, we will uphold the decision of the district court on appeal "unless a clear and prejudicial abuse of discretion is demonstrated." *Keiter v. Keiter*, 2010 UT App 169, ¶ 16, 235 P.3d 782.

---

[23] To the extent these deficiencies are due to the negligence of Ms. Dahl's counsel, her remedy lies in a civil action for malpractice.  But attorney negligence does not provide a basis for us to sidestep the legal standard that our statutes and case law prescribe for alimony determinations.

1. The District Court Made Sufficient Findings of Fact to Support Its Distribution of Marital Assets

¶120  Ms. Dahl argues generally that the district court failed to make adequate findings of fact to support its distribution of marital assets.  Specifically, she claims that the district court did not fully account for the personal property, such as furnishings, located inside the marital home.  We disagree and hold that the court's Findings of Fact and Conclusions of Law are sufficient to support its distribution of the marital property.

¶121  Before a district court distributes marital assets, it must (1) "identify the property in dispute and determine whether [it] is marital or separate property," (2) "consider whether there are exceptional circumstances that overcome the general presumption that marital property be divided equally," (3) "assign values to each item of marital property so that [a] distribution strategy . . . can be implemented," and (4) distribute the marital assets "consistent with the distribution strategy." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 15, 176 P.3d 476.  District courts must then enter findings of fact establishing that the court's "judgment or decree follows logically from, and is supported by, the evidence."  *Gardner v. Gardner*, 748 P.2d 1076, 1078 (Utah 1988).  In reviewing a property distribution, we will not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous, and we give due regard to the district court's superior position from which to judge the credibility of witnesses.  *Stonehocker*, 2008 UT App 11, ¶ 17.

¶122 The district court in this case properly followed the approach established in *Stonehocker* in distributing the marital assets.  First, it identified the items in dispute, ranging from home furniture and automobiles to businesses and real estate, and determined whether such property was properly classified as marital property or separate property.  Next, the court adopted a strategy of dividing the marital assets evenly between Dr. Dahl and Ms. Dahl. In its Findings of Fact and Conclusions of Law, it itemized the marital property and determined that the value of the property should be divided evenly between the parties.  The court then assigned values to the property in dispute based on evidence presented at trial.  For example, the court itemized the items contained in the marital home and assigned a value. Finally, the district court distributed the property according to its distribution strategy of dividing the assets evenly.

¶123 Based on its thorough evaluation of the marital and separate property, we hold that the district court made sufficient findings of fact to support its conclusion regarding the division of the marital assets. We further hold that the findings were based on the evidence presented to the district court and were sufficiently detailed to disclose the steps by which it reached the ultimate distribution.

2. The District Court Erred in Part in Its Distribution of the Liquid Assets and Litigation Costs

¶124 Ms. Dahl's next claims of error concern the district court's distribution of specific liquid assets and litigation costs. Ms. Dahl argues that the district court abused its discretion by (1) ordering Ms. Dahl to return $162,000 that Dr. Dahl had voluntarily given her over the course of the divorce proceedings; (2) ordering Ms. Dahl to pay one-half of the supervision, guardian ad litem, and custody evaluation costs incurred by the parties; (3) ordering Ms. Dahl to pay for the trial transcripts; (4) finding that a Visa credit card was marital debt; and (5) not valuing undisclosed marital assets. On review, we will uphold the district court's ruling unless it clearly abused its discretion. *Stonehocker,* 2008 UT App 11, ¶ 8. We address each of Ms. Dahl's claims of error in turn.

a. The Trial Court Erred in Requiring Ms. Dahl to Refund to the Marital Estate $162,000 that Dr. Dahl Voluntarily Paid Ms. Dahl Over the Course of the Divorce Proceedings

¶125 During the pendency of the divorce action, Dr. Dahl remained in possession of the marital home with access to marital funds, while Ms. Dahl lived outside the marital home and had no such access. While the divorce action was proceeding, the district court ordered Dr. Dahl to pay Ms. Dahl three one-time payments totaling $19,000, and Dr. Dahl voluntarily paid Ms. Dahl $4,000 per month. All totaled, Ms. Dahl received $162,000 in payments from Dr. Dahl during the pendency of the divorce proceeding. During this period, Dr. Dahl had access to the entirety of the marital funds and continued to use those funds to pay for his own living expenses and the expenses of the couple's children. The district court ordered Ms. Dahl to repay to the marital estate the $162,000 she had received, but did not require Dr. Dahl to repay the marital funds he spent during the years the divorce was proceeding. Ms. Dahl argues that this was an abuse of discretion. We agree.

¶126 Prior to the entry of a divorce decree, all property acquired by parties to a marriage is marital property, owned equally by each party. *See Berger v. Berger*, 713 P.2d 695, 697 (Utah 1985) (explaining that a "marital estate should be valued as of the time of the divorce decree"). For this reason, it is improper to allow one spouse access to marital funds to pay for reasonable and ordinary living expenses while the divorce is pending, while denying the other spouse the same access. Allowing both spouses equal access to marital funds during the pendency of a divorce promotes the goal of a "fair, just, and equitable" distribution of marital property. *Noble v. Noble*, 761 P.2d 1369, 1373 (Utah 1988).

¶127 This principle is illustrated in *In re Marriage of Marriott*, a case in which the Court of Appeals of Illinois was asked to determine whether money paid by the husband to the wife during the divorce proceeding was a preliminary distribution of marital assets. 636 N.E.2d 1141 (Ill. App. Ct. 1994). In that case, the husband and wife lived in separate housing during the dissolution proceedings with the husband remaining in the marital home. *Id* at 1149. The wife received a lump sum of money from the husband that she used to pay for living expenses and periodic temporary maintenance. *Id.* at 1145. The district court held that the lump sum was a preliminary distribution of the marital assets. *Id.* at 1149. But the Illinois Court of Appeals reversed, reasoning that the sum was an allowance for living expenses. *Id.* at 1151. The court concluded that marital assets used by a spouse who is not living in the marital home during the pendency of a divorce should not be treated differently than the marital assets enjoyed by the spouse living in the marital home so long as the funds are spent on living expenses. *Id.*

¶128 Here, like the wife in *Marriott*, Ms. Dahl lived outside the marital home during the pendency of the divorce, while Dr. Dahl remained in the marital home. Similarly, Dr. Dahl remained in control of the marital funds and marital bank accounts, while Ms. Dahl had no such access. Indeed, her only access to marital funds was through the three one-time payments ordered by the court and the $4,000 payment from the marital estate that Dr. Dahl made voluntarily. And the record reflects that Ms. Dahl, like the wife in *Marriott*, used the money she was given to pay for living expenses during the pendency of the divorce.

¶129 It was an abuse of discretion for the district court to order Ms. Dahl to repay the $162,000. This order had the effect of allowing

one spouse to use marital funds to pay for living expenses during the pendency of the divorce, while denying such use to the other spouse. We accordingly reverse.

b. The Trial Court Erred When It Ordered Ms. Dahl to Pay for One-Half of Certain Litigation Costs

¶130 During the pendency of the divorce, Dr. Dahl paid all of the costs associated with the divorce action, including $16,475 for the custody evaluation; $21,600 plus an undetermined amount of fees for the guardian ad litem; and $60,528.60 for supervised parent time. The district court determined that these costs were jointly incurred by the parties and reduced Ms. Dahl's share of the marital estate by the value of one-half of the total costs. Ms. Dahl argues that it was inequitable for the court to reduce her postjudgment share of the marital estate when Dr. Dahl paid for those costs using marital funds. Because Dr. Dahl used marital funds to pay for these costs, Ms. Dahl reasons that both parties' share in the marital estate was decreased by equal amounts, and therefore her share should not have been additionally reduced. We agree.

¶131 As discussed above, "[t]he overarching aim of a property [distribution] . . . is to achieve a fair, just, and equitable result between the parties." *Noble,* 761 P.2d at 1373. Before the district court can undertake the distribution, it must determine the value of the assets. *Stonehocker*, 2008 UT App 11, ¶ 15. And it is well-settled that assets should be valued at the time of the divorce decree. *Dunn v. Dunn*, 802 P.2d 1314, 1319 (Utah Ct. App. 1990). On review, the district court's factual findings as to the value of assets will not be disturbed unless they are clearly erroneous. *Id.* at 1317.

¶132 In this case, the district court correctly concluded that the supervision, guardian ad litem, and custody evaluation costs should be shared equally by the parties from the marital estate. The district court also concluded that inasmuch as Dr. Dahl had already paid the full amounts, Ms. Dahl's share of the estate must be reduced for her share of the costs.

¶133 But the district court overlooked the fact that Dr. Dahl had paid these costs and fees using the marital bank account, which consisted of marital funds. Because Dr. Dahl paid for the costs using marital funds, the value of the marital estate was reduced by the amount of those costs. Thus, when the district court divided the marital estate, both parties had effectively paid one-half of these costs. By ordering Ms. Dahl to repay Dr. Dahl one-half of the costs

from her individual share of the marital estate, the district court in effect required Ms. Dahl to pay twice.  In short, she was required to bear the entire burden of these costs.

¶134  Such a result constituted clear error.  We therefore reverse the district court's ruling because Ms. Dahl should not have been required to pay for one-half of the fees from her share of the estate when Dr. Dahl used marital funds to pay for the costs during the litigation.

c.  The Trial Court Correctly Concluded that Ms. Dahl Must Pay for the Trial Transcripts

¶135  Ms. Dahl ordered daily transcripts of the trial proceedings at a total cost of $35,217.65.  The district court granted Ms. Dahl's request for transcripts on the understanding that she would, as the requesting party, be required to bear the cost.  On appeal, Ms. Dahl argues that the district court abused its discretion by requiring her to pay for the transcripts without making findings of fact regarding her ability to pay.  We disagree.

¶136 Utah courts no longer routinely employ live court reporters.  Instead, trial transcripts are prepared from digital recordings.  During a pretrial motion hearing on September 15, 2009, Ms. Dahl's attorney requested that daily transcripts of the trial be prepared by a live court reporter.  The district court offered the alternative of providing daily copies of the recording disk to minimize expenses.  But Ms. Dahl's attorney refused the offer and requested permission to use a live court reporter for daily transcripts. The district court granted the request, but informed Ms. Dahl's attorney that, as the party requesting the live reporter, Ms. Dahl would be solely responsible for paying all reporter fees.  Ms. Dahl's counsel agreed.

¶137  Subsequently, Ms. Dahl requested that Dr. Dahl pay for the reporter costs, but the district court ordered that Ms. Dahl bear the entire cost.  We hold that it was not an abuse of discretion for the district court to require that Ms. Dahl pay all of the reporter costs. It was, after all, Ms. Dahl who requested the live reporter and she persisted in that request even after the district court informed her that she would be responsible for all the associated costs. The district court offered the alternative of releasing the audio disk, but Ms. Dahl's attorney declined the offer.  Under these circumstances, it was an appropriate exercise of the district court's discretion to assign those costs entirely to Ms. Dahl.

d. The District Court Did Not Abuse Its Discretion by Concluding that Certain Unsecured Debt Was Marital Debt

¶138  Ms. Dahl's next claim of error involves the district court's distribution of the parties' unsecured debt.  As of July 31, 2009, a Wells Fargo Visa account had a balance of $24,053.  The district court found that this balance was a marital debt and reduced both parties' share of the marital estate equally.  Ms. Dahl argues that this finding was erroneous.  Specifically, Ms. Dahl argues that the Visa card was not listed on Dr. Dahl's 2006 Statement of Income, Expenses, Assets, and Liabilities report (2006 Report), which was filed near the inception of the divorce proceeding.  Ms. Dahl reasons that, because the Wells Fargo Visa account was not listed on the 2006 report, any balance on the account must therefore have been the result of Dr. Dahl's postseparation spending.

¶139  Under Utah Code section 30-2-5(1)(b), neither spouse is personally liable for the separate debts incurred by the other spouse during the marriage.  But both spouses are responsible for family expenses.  UTAH CODE § 30-2-9(1).  Nevertheless, there is no fixed formula for determining the division of debts in a divorce action.  We require only that the district court's allocation of debt be based on adequate factual findings.  *Stonehocker*, 2008 UT App 11, ¶ 46.  And we will not disturb those findings absent an abuse of discretion. *Id.*

¶140  Here, the district court determined that the Wells Fargo Visa was marital debt.  Ms. Dahl challenges that ruling, asserting that Dr. Dahl's failure to testify as to the nature of the debt mandated the conclusion that it was his separate debt.  But during trial, the district court heard extensive testimony from Dr. Dahl's expert witness, Mr. Stoddard, regarding all of Dr. Dahl's accounts.  Ms. Dahl points to no evidence in the record to refute Mr. Stoddard's testimony that the Visa account was a marital debt.  We conclude that Mr. Stoddard's testimony was sufficient to support the district court's finding that the debt was marital.  We therefore affirm the district court's ruling.

e. Ms. Dahl's Argument that the District Court Failed to Equitably Distribute Some Personal Property Is Inadequately Briefed

¶141 Finally, Ms. Dahl argues the district court abused its discretion in the distribution of marital property because it did not consider all of the tangible assets located in the marital home, in

which Dr. Dahl continues to reside. But Ms. Dahl has failed to point to any specific items that were excluded from the property distribution. We have repeatedly stated that "[a]ppellate courts are not a depository in which [a party] may dump the burden of argument and research." *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 16, 309 P.3d 201 (internal quotation marks omitted) (alternations in original); *see also Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 23 n.9, 48 P.3d 918 ("A single, vague sentence without citation to the record or legal authority is inadequate."). The record in this case spans thousands of pages and the assets involved are valued in the millions of dollars. As appellant, Ms. Dahl bears the burden of directing our attention to specific facts in the record to support her contention that the district court abused its discretion. Ms. Dahl cannot simply assert error without explanation or evidence and expect this court to reverse the finding of the district court. Accordingly, we are not persuaded by this inadequately briefed argument.

3. The District Court Did Not Abuse Its Discretion When It Concluded That the IRA and SEP IRA Remained Separate Property

¶142 The district court found that a number of Dr. Dahl's retirement accounts, including a traditional IRA and a SEP IRA, were established and funded by Dr. Dahl prior to his marriage to Ms. Dahl and therefore held that these accounts were Dr. Dahl's separate property. Ms. Dahl argues that this holding was erroneous. Ms. Dahl acknowledges that the IRA accounts were established before their marriage, but asserts that they lost their identity as separate property when Dr. Dahl commingled them with marital funds. Specifically, Dr. Dahl withdrew funds from the IRA to pay off a home equity loan secured by the marital home and then replenished the funds using a marital bank account. Ms. Dahl argues that this action converted the IRAs to marital property. We disagree.

¶143 "Generally, premarital property, gifts, and inheritances [are considered] separate property, and the spouse bringing such . . . property into the marriage may retain it" in the event of a divorce. *Keiter v. Keiter*, 2010 UT App 169, ¶ 22, 235 P.3d 782 (internal quotation marks omitted) (internal alterations omitted). But premarital property may lose its separate character where the parties have inextricably commingled it with the marital estate, or where one spouse has contributed all or part of the property to the marital estate with the intent that it become joint property. *Dunn*, 802 P.2d at 1320. Courts look to a party's actions as a manifestation of a

spouse's intent to contribute separate property to the marital estate. *Kimball v. Kimball*, 2009 UT App 233, ¶ 28, 217 P.3d 733. On review, we will uphold the district court's decision that the IRAs remained Dr. Dahl's separate property unless the district court abused its discretion. *Stonehocker*, 2008 UT App 11, ¶ 8.

¶144 Ms. Dahl claims that the IRA accounts became commingled with marital assets. But Dr. Dahl's IRA accounts never lost their separate identity. Dr. Dahl withdrew money from his IRA accounts so that he could pay off a home equity loan secured by the marital home. After paying off the loan, Dr. Dahl replaced the amounts withdrawn from the IRA accounts with funds from the marital bank account. This transaction is best characterized as a loan from Dr. Dahl to the marital estate, which was in turn repaid with marital funds. There is nothing about these transactions suggesting that Dr. Dahl intended to commingle his IRA funds with the marital estate. And Dr. Dahl's property did not become so "inextricably commingled . . . into the marital estate" that the district court was incapable of tracing it. *Dunn*, 802 P.2d at 1321.

¶145 We therefore affirm the district court's conclusion that the IRA accounts are separate property. The evidence supports the district court's conclusion that Dr. Dahl did not intend for the IRA accounts to become joint property and that the IRA account did not lose its separate identity simply because Dr. Dahl made a loan from the account to pay off a home equity loan.

4. The District Court Did Not Abuse Its Discretion When It Found That the 1031 Property Exchanges Were Separate Property

¶146 Dr. Dahl claimed that four parcels of real property (1031 Properties) were separate property, despite being acquired during the marriage. The district court concluded that the four parcels were acquired via a series of exchanges pursuant to section 1031 of the Internal Revenue Code (1031 exchanges). 26 U.S.C. § 1031. Section 1031 allows a party to exchange one parcel of real property for another without incurring any tax burden. *See id.* § 1031(a)(1). ("No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."). A spouse can maintain the separate identity of premarital property by utilizing section 1031 exchanges to avoid commingling separate property with marital property. For example, a spouse may use the proceeds of the sale of a house he or she

inherited to purchase another property through a section 1031 exchange, allowing the new property to retain the same separate character as the house whose proceeds were used to purchase the new property. *See Smith v. Smith*, Nos. CT2003-0008, CT2003-0020, 2004 WL 193041 (Ohio Ct. App. Jan. 22, 2004) (holding that property subject to a section 1031 exchange remained separate property for the purposes of distribution in a divorce action).

¶147 Ms. Dahl argues that the district court abused its discretion when it determined that the properties derived from the sale or transfer of Dr. Dahl's separate property through section 1031 exchanges remained Dr. Dahl's separate property. At trial, Dr. Dahl's expert witness, Mr. Stoddard, testified extensively regarding the acquisition of the 1031 Properties. Relying on Mr. Stoddard's testimony, the district court found that the 1031 Properties, aside from 14 percent of one property, were Dr. Dahl's separate assets. Ms. Dahl received credit for one-half of the 14 percent determined to be marital property, while Dr. Dahl was awarded the remaining 1031 Properties.

¶148 Ms. Dahl challenges this ruling on several grounds. First, Ms. Dahl argues that the trial exhibits relied on by Mr. Stoddard were inadmissible. Second, Ms. Dahl claims that Dr. Dahl did not provide sufficient evidence to prove that the Lamona property, the initial property sold by means of a 1031 exchange, was entirely Dr. Dahl's separate property. Third, Ms. Dahl argues that all of the subsequent 1031 exchanges could not be properly traced back to the premarital asset, the Lamona property, due to incomplete evidence. Finally, Ms. Dahl claims that the funds from the 1031 exchanges had been commingled with marital assets.

¶149 At heart, Ms. Dahl's challenge to the district court's ruling on the 1031 Properties is a challenge to the sufficiency of the evidence. Her central assertion is that the district court lacked sufficient evidence to conclude that the 1031 Properties originated from premarital assets. A party challenging a district court's factual findings on appeal bears a heavy burden of persuasion. *See Drake v. Indus. Comm'n*, 939 P.2d 177, 181 (Utah 1997). Our review of such findings is highly deferential, and we will reverse only if the findings are clearly erroneous. *Id.* Moreover, a party challenging factual findings on sufficiency of the evidence grounds "will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal" the evidence sufficient to overcome "the healthy dose of

deference owed to factual findings." *State v. Nielsen*, 2014 UT 10, ¶¶ 41–42, 326 P.3d 645.

¶150  Ms. Dahl has failed to meet her burden in this case. The district court made factual findings regarding the source of the 1031 Properties based on testimony from Dr. Dahl and expert testimony from Mr. Stoddard. Though Ms. Dahl complains that Mr. Stoddard relied on inadmissible evidence in his testimony, such reliance is clearly permitted by our rules of evidence. *See* UTAH R. EVID. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Similarly, Ms. Dahl argues that Dr. Dahl's testimony was self-serving and that Dr. Dahl failed to provide all of the documentation he could have provided to substantiate his and Mr. Stoddard's testimony. But a district court is not precluded from relying on self-serving testimony and a party need not offer into evidence every document on which his expert witness relied. *See* UTAH R. EVID. 705. Thus, Ms. Dahl's argument comes down to a challenge to the credibility of Dr. Dahl and Mr. Stoddard. But it is the district court's role to judge the credibility of witnesses and to weigh their testimony. And Ms. Dahl can point to nothing suggesting that the evidence relied on by the district court was legally insufficient to support its factual findings. Accordingly, we affirm.

5.  The District Court Did Not Abuse Its Discretion in Ruling on the Character of Dr. Dahl's Premarital Pension Plan

¶151  The district court determined that a number of retirement accounts were established and funded by Dr. Dahl prior to his marriage to Ms. Dahl, including the Charles F. Dahl M.D. PC Profit Sharing Trust (Profit Sharing Trust). Because it found that the Profit Sharing Trust was funded prior to the marriage, the district court concluded that it remained Dr. Dahl's separate property. Ms. Dahl's final claim of error as to the distribution of marital assets is that the district court failed to consider commingling of marital assets with the Profit Sharing Trust. At trial, Dr. Dahl testified that $533.86 was transferred into his profit sharing plan on a monthly basis. Because Dr. Dahl testified that he could not recall from which account the deposits originated, Ms. Dahl argues that Dr. Dahl failed to prove that this monthly deposit came from nonmarital funds.

¶152  Ms. Dahl's argument is a challenge to the sufficiency of the evidence relied upon by the district court. And again, Ms. Dahl has failed to meet her burden of persuasion. Though Dr. Dahl did

acknowledge that he could not be certain as to the account from which the monthly deposit originated, he testified that he believed the recurring deposit was from a limited real estate partnership that paid a dividend every month and that this partnership was his separate property. In the absence of any evidence to the contrary from Ms. Dahl, we cannot conclude that the district court abused its discretion in determining that the Profit Sharing Trust was funded with premarital property and therefore remained Dr. Dahl's separate property. Accordingly, we affirm.

*E. The District Court Did Not Abuse Its Discretion in Awarding Dr. Dahl Sole Physical and Legal Custody of the Parties' Minor Children*

¶153 Initially, both Dr. Dahl and Ms. Dahl requested sole legal and physical custody of the children. Because they were both seeking sole custody, neither party filed a proposed parenting plan in accordance with section 30-3-10.8 of the Utah Code, which requires any party seeking joint legal or physical custody to submit such a plan. Four months before trial, an independent custody evaluator submitted a custody evaluation to the court. The evaluation recommended that Dr. Dahl be awarded sole legal custody. In regard to physical custody, the evaluator recommended a variety of possible arrangements, including some joint custody arrangements. The evaluator did not, however, include among the options awarding Ms. Dahl sole physical custody.

¶154 One week before trial, Ms. Dahl filed a motion to amend her counterclaim to seek joint legal and physical custody. She supported that motion with a proposed parenting plan. The district court denied her request as untimely, reasoning that the language of section 30-3-10.8 required that any parenting plan be filed with an original pleading. Thus, Ms. Dahl could not file a parenting plan with an amended pleading. Ms. Dahl argues that the district court misinterpreted section 30-3-10.8 and that she should have been granted leave to amend her pleadings to request joint custody and file a parenting plan. Although we agree that the district court misinterpreted section 30-3-10.8, we nevertheless affirm the district court's custody determination on alternate grounds.

1. Parties May File a Parenting Plan with Amended Pleadings

¶155 "In custody matters, appellate courts generally give the [district] court considerable discretion because the [district] court's proximity to the evidence places it in a better position than an appellate court to choose the best custody arrangement." *Trubetzkoy*

*v. Trubetzkoy*, 2009 UT App 77, ¶ 6, 205 P.3d 891 (citation omitted). But this broad discretion "must be guided by the governing law adopted by the Utah Legislature." *Id.* And on matters of statutory interpretation, we review for correctness. *Baird v. Baird*, 2014 UT 08, ¶ 16, 322 P.3d 728.

¶156 A district court "may order joint legal custody or joint physical custody or both if one or both parents have filed a parenting plan in accordance with Section 30-3-10.8 and it determines that joint legal custody or joint physical custody or both is in the best interest of the child." UTAH CODE § 30-3-10.2(1). Thus, the statute establishes two prerequisites for a district court's award of joint custody: (1) the filing of a parenting plan and (2) a determination that joint custody is in the child's best interest. Section 30-3-10.8 requires that a party requesting joint custody file his or her parenting plan "at the time of the filing of their *original petition* or at the time of filing their answer or *counterclaim*." (Emphasis added).

¶157 In this case, both parties initially sought sole custody of the children. Therefore, neither party filed a parenting plan with their original pleading. We must therefore consider whether section 30-3-10.8 confines requests for joint custody to initial pleadings or whether the statute allows a party to seek joint custody through an amended pleading.

¶158 Although this is a question of first impression for this court, our court of appeals considered a related issue in *Trubetzkoy*. In *Trubetzkoy*, the court of appeals reversed a district court's award of joint custody because neither parent had filed a parenting plan. 2009 UT App 77, ¶ 13. The district court in this case relied on the *Trubetzkoy* decision in determining that it was precluded from considering joint custody in the absence of a parenting plan. Although we agree with the court of appeals that the complete absence of a parenting plan precludes an award of joint custody, *see* UTAH CODE § 30-3-10.2, *Trubetzkoy* offers no insight into the question of whether section 30-3-10.8 allows parties to amend their initial pleadings to later seek joint custody and to file a parenting plan in connection with those amended pleadings.

¶159 Our primary goal when interpreting statutes is to effectuate the intent of the Legislature. *State v. Watkins*, 2013 UT 28, ¶ 18, 309 P.3d 209. Our starting point is therefore the plain language of the statute. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863. Further, "we interpret[] statutes to give meaning

to all parts, and avoid[] rendering portions of the statute superfluous." *Watkins*, 2013 UT 28, ¶ 23 (internal quotation marks omitted) (alterations in original). To do so, "we read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *State v. Barrett*, 2005 UT 88, ¶ 29, 127 P.3d 682 (internal quotation marks omitted).

¶160 Section 30-3-10.8 requires that parties seeking joint custody file a proposed parenting plan "at the time of the filing of their original petition or at the time of filing their answer or counterclaim." Dr. Dahl suggests that this language precludes parties who initially seek sole custody from amending their pleadings to seek joint custody, even if they later become convinced that joint custody would be best for their children. But such a reading would conflict with other statutory provisions in which the Legislature has placed a high value on joint custody. The Legislature has mandated that district courts "shall, in every case, consider joint custody."[24] UTAH CODE § 30-3-10(1)(b) (2009). Moreover, custody determinations are equitable in nature and require the court to consider the best interests of the child "[i]n determining any form of custody." *Id.* § 30-3-10(1)(a). If parties are unable to amend their pleadings to file a parenting plan, the court's equitable mandate to consider the best interests of the child would be severely impaired.

¶161 A more persuasive construction of section 30-3-10.8 brings it in line with our relatively liberal standards for amendments to pleadings. Rule 15(a) of the Utah Rules of Civil Procedure allows a party to amend a pleading with permission from the district court and directs that "leave [to amend] shall be freely given when justice

---

[24] In 2012, the Legislature amended subsection 10(1)(b), establishing "a rebuttable presumption that joint legal custody . . . is in the best interest of the child," except in a narrow range of cases. UTAH CODE § 30-3-10(1)(b) (2012). Because we are reviewing the district court for abuse of discretion, we apply the version of subsection 10(1)(b) that was in force at the time of the court's ruling. *See Thronson v. Thronson*, 810 P.2d 428, 433 (Utah Ct. App. 1991) (applying the statute that was in place at the time of the district court's decision, rather than retroactively applying the new version of the statute, when reviewing the court under an abuse of discretion standard).

so requires." Surely justice is served by allowing parents, and the district court, to consider whether joint custody would be in the best interests of children in a divorce action. Rather than trapping parents into the custody option they select at the time of their initial pleading, with no allowance for changed circumstances, a better reading of section 30-3-10.8 would allow parents to file an amended pleading to include a parenting plan, if such an amendment satisfies rule 15. Accordingly, we conclude that the district court erred in its interpretation of section 30-3-10.8 and that it should have allowed Ms. Dahl to file a parenting plan in the event that it granted her motion to amend. However, for the reasons discussed below, we affirm on the alternate ground that the district court did not abuse its discretion in denying Ms. Dahl's motion to amend.

2. The District Court's Denial of Ms. Dahl's Motion to Amend Was Not an Abuse of Discretion

¶162 As noted above, rule 15(a) of the Utah Rules of Civil Procedure permits litigants to amend their pleadings with permission of the court and directs that leave "shall be freely given when justice so requires." District courts "should liberally allow amendments unless the amendments include untimely, unjustified, [or] prejudicial factors." *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 58, 221 P.3d 256. A motion is untimely if it is "filed in the advanced procedural stages of the litigation process." *Id.* ¶ 59 (internal quotation marks omitted). "Motions are prejudicial when the nonmoving party would have little time to prepare a response before trial." *Id.* "And many other factors, such as delay, bad faith, or futility of the amendment, may weigh against the [district] court's allowing the amendment." *Id.* ¶ 58. (internal quotation marks omitted). "Because a district court is best positioned to evaluate the motion to amend in the context of the scope and duration of the lawsuit, we will reverse a denial of leave to amend only if the district court abused its discretion." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 18, 243 P.3d 1275 (internal quotation marks omitted).

¶163 Our review of the record reveals that the district court did not abuse its discretion in this case by denying Ms. Dahl's motion for leave to amend because Ms. Dahl's motion was untimely and prejudicial and her proposed amendment would have been futile in any event. The custody proceedings in this case were highly contentious. The custody evaluation makes clear that the parties and their counsel behaved in ways that stymied the custody process and ultimately delayed its completion. As a result, the custody

evaluation was not completed until May 2009.  On August 31, 2009, Dr. Dahl filed a motion to exclude consideration of joint custody on the basis that no parenting plan had been filed.  One week before trial, on September, 9, 2009, Ms. Dahl filed her motion to amend.

¶164  We have consistently refused to establish a bright-line rule for when a motion to amend under rule 15 is untimely.  *See Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 29, 87 P.3d 734 (collecting cases).  But we have recognized that timeliness is intricately tied to the potential for prejudice to the other parties.  "We have consistently held that a [district] court does not abuse its discretion when it denies as untimely last minute motions on the eve of trial."  *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 17, 163 P.3d 615 (collecting cases).  And that consideration is dispositive here.  Despite receiving the child custody evaluation in May, Ms. Dahl waited nearly four months, until the week before trial, to move to amend her counterclaim and seek joint custody.  Given that the custody evaluation was not finished until late in the litigation, Ms. Dahl's delay might have been excused had she filed quickly after receiving the evaluation.  But she has offered no explanation for waiting until the eve of trial to seek an amendment, and Dr. Dahl would surely have been prejudiced had he been required to oppose joint custody at that late date.  On these facts, the district court did not abuse its discretion when it denied Ms. Dahl's motion to amend.

¶165  Moreover, our review of the record convinces us that any error on the part of the district court in denying Ms. Dahl's motion to amend was harmless because the evidence does not suggest that joint custody would have been in the best interests of the Dahls' children.  In denying Ms. Dahl's motion to amend, the district court stated:

> Frankly, I think it unlikely that I would order joint custody in this case because I don't perceive that these parties are able to effectively cooperate to raise the children.  I'm open to argument and I'll consider the best interests [of the children] when I hear all the evidence but as of right now, I think this is not a particularly important question because I think it unlikely that joint custody is going to be the result here.

And nothing in the evidence offered at trial suggested otherwise.  Indeed, the custody evaluation itself emphasized the need to minimize interaction between Dr. Dahl and Ms. Dahl in any custody

arrangement. Given the district court's stated reservations about the parties' ability to cooperate in their children's best interests and its determination that "the best interests of the children dictates that [Dr. Dahl] receive sole legal and physical custody," any error in denying Ms. Dahl's motion to amend was harmless.

### F. *The District Court Did Not Abuse Its Discretion When It Refused to Award Attorney Fees to Ms. Dahl*

¶166 Ms. Dahl's final claim of error is that the district court abused its discretion when it denied her request for attorney fees. Ms. Dahl's attorneys submitted a claim for $2,186,568 in attorney fees, litigation costs, and interest charges through January 31, 2010.[25] At trial, Ms. Dahl requested an order that Dr. Dahl be required to contribute to the payment of her attorney fees and expenses incurred in the divorce action. The district court denied Ms. Dahl's request, finding that Ms. Dahl, through her counsel, had failed to present evidence of her financial need and because the fees and costs claimed by Ms. Dahl's attorneys were unreasonable. The district court alternatively denied the request on the ground that the fee arrangement between Ms. Dahl and her attorneys constituted a prohibited contingency fee agreement in a domestic matter.

¶167 Ms. Dahl argues that the district court abused its discretion when it denied her request for attorney fees. Specifically, she argues that her fee arrangement with her attorney was not a prohibited contingency fee agreement. She also asserts that the district court allowed Dr. Dahl to pay his own attorney fees out of marital funds, while denying her the same right. She asks us to order that Dr. Dahl be required to pay her fees and additionally requests that we award her the attorney fees she has expended on this appeal.

1. Ms. Dahl Was Not Entitled to an Award of Fees Because She Failed to Demonstrate Her Financial Need and Her Claimed Fees Were Unreasonable

¶168 "In Utah, attorney fees are awardable only if authorized by statute or by contract." *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988). Section 30-3-3(1) of the Utah Code authorizes courts to award attorney fees and costs in divorce cases if doing so would "enable the other party to prosecute or defend the action." "Such an award must be based on evidence of the receiving spouse's financial

---

[25] This claim for fees does not include any fees incurred after January 2010, including fees related to this appeal.

need, the payor spouse's ability to pay,[26] and the reasonableness of the requested fees." *Levin v. Carlton*, 2009 UT App 170, ¶ 27, 213 P.3d 884 (internal quotation marks omitted). The party requesting an award of fees has the burden of providing such evidence. *Griffith v. Griffith*, 959 P.2d 1015, 1020–21 (Utah Ct. App. 1998). The decision of whether to award attorney fees pursuant to section 30-3-3 of the Utah Code rests in the sound discretion of the district court. As such, we review the district court's award or denial of fees for abuse of discretion. *Kimball v. Kimball*, 2009 UT App 233, ¶ 19, 217 P.3d 733. An award based on insufficient factual findings is an abuse of discretion and requires remand. *Leppert v. Leppert*, 2009 UT App 10, ¶ 25, 200 P.3d 223.

¶169 The district court refused Ms. Dahl's request for fees pursuant to section 30-3-3 for two reasons. First, the court found, as a factual matter, that Ms. Dahl had adopted a consistent trial strategy wherein she declined to provide "competent and complete evidence" of her financial need. Thus, she failed to meet her burden of establishing financial need. Second, the court found that the fees claimed by Ms. Dahl's attorneys were unreasonable. Thus, she failed to meet her burden of establishing the reasonableness of the requested fees. Ms. Dahl asserts that both findings are erroneous. We disagree.

a. Ms. Dahl Failed to Provide Evidence of Her Financial Need

¶170 When determining the financial need of the requesting spouse, we "generally look to the requesting spouse's income, including alimony received as the result of a divorce decree; the property received via the property distribution award; and his or her expenses." *Kimball*, 2009 UT App 233, ¶ 46. Parties to a divorce action often incur debt to retain counsel. While the existence of such indebtedness may tend to show financial need, *id.*, it is not determinative if other factors, such as a property award, are present.

¶171 Here, the district court explicitly found that Ms. Dahl "presented no credible testimony to establish her current financial need." Despite explicit direction from the district court that any claims for spousal support or for access to marital assets would require evidence of Ms. Dahl's financial need, she consistently "provided only a rough estimate of what was available to her in the

---

[26] The parties do not dispute Dr. Dahl's ability to pay for Ms. Dahl's attorney fees.

years before separation" and declined to provide any specific evidence of her postseparation finances. In fact, the district court instructed Ms. Dahl's counsel on no less than five occasions to provide a financial declaration that would satisfy the court. But Ms. Dahl failed to do so. Prior to trial, the district court considered whether to dismiss Ms. Dahl's claim for alimony because she had failed to designate a financial declaration in her pretrial exhibits. Ms. Dahl's counsel "confirmed that no financial declaration would be presented during trial" and that "he intended to rely upon financial information presented in 2007."

¶172 Although Ms. Dahl continues to assert that she had no independent means of paying for her attorney fees and could not work because of her medical problems, she fails to point to any evidence refuting the district court's thoughtful and extensive findings of fact. And she makes no attempt to explain her failure to submit a sufficient financial declaration. She does not dispute that she declined to present a financial declaration at trial and instead relied on financial information from 2007, then more than two years out of date. Nor does she dispute the district court's factual determination that her testimony at trial was not credible. Instead, Ms. Dahl merely restates the same arguments she made at trial, which rely on the very testimony the district court found to be noncredible.

¶173 Parties challenging the factual findings of the district court bear a heavy burden of persuasion. *See Drake v. Indus. Comm'n of Utah*, 939 P.2d 177, 181 (Utah 1997). Our review of such findings is highly deferential and we will reverse the district court only if its findings are clearly erroneous. *Id.* We give this deference to the district court "because it stands in a superior position from which to evaluate and weigh the evidence and assess the credibility and accuracy of witnesses' recollections." *Id.* Ms. Dahl has not met this burden. She points to no evidence that would support the conclusion that the district court's findings of fact were clearly erroneous.[27]

---

[27] Ms. Dahl argues that, once she made a prima facie showing that she could not work, the "burden should have shifted to Dr. Dahl to demonstrate [her] earning capacity." This is a misstatement of the governing law. The burden of proof rests with the party requesting

(continued...)

¶174 Finally, Ms. Dahl's claim of financial need is not persuasive because she fails to acknowledge the substantial property distribution she was awarded from the marital assets. The district court could properly take this distribution into account when evaluating Ms. Dahl's financial need. Given Ms. Dahl's failure to refute the district court's factual findings, as well as the substantial property distribution she was awarded, we cannot conclude that the district court abused its discretion in declining Ms. Dahl's request for fees.

b. Ms. Dahl's Claim for Attorney Fees and Costs Was Unreasonable

¶175 The district court also found Ms. Dahl's claim for more than $2.1 million in attorney fees and costs was unreasonable. Ms. Dahl argues that this finding was an abuse of discretion. We disagree.

¶176 When evaluating the reasonableness of a request for attorney fees pursuant to section 30-3-3, courts look to a variety of factors.

> Reasonable attorney[] fees are not measured by what an attorney actually bills, nor is the number of hours spent on the case determinative in computing fees. . . . A court may consider, among other factors, the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the reasonableness of the number of hours spent on the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved.

*Cabrera v. Cottrell*, 694 P.2d 622, 624–25 (Utah 1985); *see also* UTAH R. PROF'L CONDUCT R. 1.5(a) (establishing factors to be considered in determining the reasonableness of an attorney's fees).

¶177 A review of the district court's findings of fact and conclusions of law reveals that the court carefully and thoughtfully considered the fee affidavit submitted by Ms. Dahl's attorney,

---

[27](...continued)
an award of fees. *Griffith v. Griffith,* 959 P.2d 1015, 1020–21 (Utah Ct. App. 1998).

Mr. Christiansen, which detailed the fees requested by all of Ms. Dahl's various attorneys. The court made extensive findings of fact on the issue of attorney fees. It found that the claim for fees and costs submitted by Mr. Christensen was "extraordinarily large," totaling $2,186,568.57 in fees, costs, expenses, and interest charges. In particular, the court noted that Mr. Christensen's claim for fees was "[b]y far the largest debt identified in th[e] proceedings."

¶178 Ms. Dahl was represented by several different attorneys and law firms. The court carefully considered the appropriateness of the hours claimed by each attorney. In considering the reasonableness of her fee request, the district court found that even if the hours billed by Ms. Dahl's first several attorneys were reasonable, those fees could not fairly be said to have advanced the litigation because Ms. Dahl opted to start over with new counsel, Mr. Christensen, in January 2007.

¶179 As for Mr. Christensen and his firm, the district court found that the hours claimed were "unreasonably large." For example, the firm billed 2,981 hours in the ten months from January through October 2009. Mr. Christensen requested hundreds of thousands of dollars in fees related to discovery of financial matters. But the court found, based on Mr. Christensen's noncompliance with discovery orders and general lack of preparation for trial, that "the discovery was not carefully managed or focused, and that the extremely high fees related to the process were not warranted." Additionally, the court found that Mr. Christensen pursued a strategy involving the "aggressive use of motions to reconsider and clarify," which "substantially increased attorney hours and expenses without materially advancing the case." More tellingly, the court found that the "huge, almost impossible hours recorded during the trial months . . . appear to be an attempt to gain an understanding of evidence and facts that should have been mastered months earlier." In short, the court's extensive factual findings paint a picture of a litigation strategy that was inefficient, ineffective, and unjustifiably costly.

¶180 Ms. Dahl argues that "[t]he complexity of the [marital] estate itself generated additional legal fees." But the district court expressly found that the issues presented in the divorce action were not particularly unique and could be addressed with "the application of well established rules of law."

¶181 The expenses for Ms. Dahl's expert witnesses were particularly troubling. As we have previously discussed, Mr.

Christensen failed to properly designate expert witnesses for Ms. Dahl and failed to submit expert reports in accordance with the requirements of rule 26. As a result, her experts' testimony was substantially limited. The district court specifically noted that this failure to properly designate and disclose expert witnesses rendered their testimony "inconsequential to the final determination of the case." Yet, Mr. Christensen requests an award covering these expert witnesses' substantial fees, totaling approximately $327,000. We agree with the district court that these claimed fees for experts who were never properly disclosed and were thus rendered useless to the litigation were unreasonable.

¶182 Finally, Ms. Dahl's briefing has failed to effectively challenge the factual findings of the district court. The court made over forty factual findings related to the issue of attorney fees. Yet, Ms. Dahl's brief fails to even mention any of the district court's specific findings. Instead, her brief relies on generalized statements that the case was complicated and the marital estate was complex, necessitating higher fees. Such conclusory allegations are insufficient to overcome our highly deferential review of the district court's findings of fact. *See Drake*, 939 P.2d at 181.

¶183 In sum, we conclude that the district court did not abuse its discretion when it declined to award attorney fees to Ms. Dahl.[28] The court's careful and thorough review of her request is apparent from its extensive findings of fact and conclusions of law. And despite devoting seventeen pages of her appellate brief to the topic of attorney fees, Ms. Dahl has failed to marshal any evidence that would support a finding of clear error. Accordingly, we affirm. We now turn our attention to whether Ms. Dahl's fee arrangement with Mr. Christensen was proper.

---

[28] Ms. Dahl also argues that, even if her claimed fees were unreasonable, the district court erred when it awarded her no fees at all. Though we agree that the proper response to a finding of unreasonable fees might be for the district court to reduce the requested amount to an "ascertainable, reasonable figure," *see Kimball v. Kimball*, 2009 UT App 233, ¶ 50, 217 P.3d 733, any error in this case was harmless because the district court denied fees under section 30-3-3 on the independent basis that Ms. Dahl had failed to establish her financial need. Because we affirm that holding, Ms. Dahl would not be entitled to any award of fees, even if such fees were reasonable.

2. Mr. Christensen's Fee Agreement with Ms. Dahl Was Improper

¶184 As an alternative ground for denying Ms. Dahl's request for attorney fees, the district court also found that the fee arrangement between Ms. Dahl and Mr. Christensen amounted to a prohibited contingency fee agreement. Ms. Dahl argues that this finding was an abuse of discretion. Mr. Christensen, in briefing, argues that Ms. Dahl is obligated to pay the entirety of his fee, "regardless of the outcome" of the case, and that the "fee was generated by the calculation of the hours worked at the applicable rate and . . . did not fluctuate based upon the amount of property [Ms. Dahl] was awarded."

¶185 The district court rejected this fee arrangement as an improper contingency fee agreement in which Mr. Christensen "created, by contract, a mechanism to seize as much as the entire proceeds awarded to [his] client from the estate to pay the bill when a recovery was achieved." In declaring the fee agreement to be prohibited, the court relied primarily on rule 1.5(d)(1) of our Rules of Professional Conduct, which prohibits attorneys from "enter[ing] into an arrangement for . . . any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of alimony or support, or property settlement in lieu thereof." The court observed that Mr. Christensen had made no attempt to collect any of his fees and instead "simply allowed the fees and costs to accumulate with substantial interest." It reasoned that the "only logical conclusion" was that Mr. Christensen's payment had "always depended upon a recovery in favor of [Ms. Dahl]."

¶186 We need not determine whether Mr. Christensen's fee arrangement constituted a prohibited contingency fee agreement in a domestic matter because we invalidate the fee arrangement on the alternate ground that it was prohibited under Utah Code section 38-2-7(9) and rules 1.8 and 1.5 of the Utah Rules of Professional Conduct.[29] *See Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158

---

[29] Following the district court's determination that Mr. Christensen had entered into a prohibited contingency fee agreement with Ms. Dahl, Dr. Dahl submitted an informal complaint to the Office of Professional Conduct (OPC). Following an inquiry, the OPC concluded that Mr. Christensen did not violate the Rules of

(continued...)

(holding that an appellate court may affirm a judgment "'on any legal ground or theory apparent on the record'"). Specifically, we hold that Mr. Christensen acquired a prohibited interest in the subject matter of his representation of Ms. Dahl and that his claimed fees are unreasonable.[30] Accordingly, we invalidate his fee arrangement with Ms. Dahl and refer Mr. Christensen to the Office of Professional Conduct.

a. Mr. Christensen Improperly Acquired a Proprietary Interest in the Subject Matter of the Representation

¶187 Ms. Dahl entered into two separate fee agreements with Mr. Christensen. The first agreement, dated January 25, 2007, covered the time in which Mr. Christensen was the owner and manager of the firm Hirschi Christensen, PLLC. The second agreement, dated January 21, 2010, but effective November 1, 2009, was with Mr. Christensen's new firm, Christensen Thornton, PLLC. Both agreements contained paragraphs entitled "Liens." These paragraphs purported to grant Mr. Christensen's firms a contractual lien on the entirety of any award that Ms. Dahl recovered in the divorce case.

¶188 Specifically, the January 2007 agreement states:

> Pursuant to § 38-2-7(2)(a), Utah Code Annotated 2001, I have a lien in the amount of my unpaid attorney's fees, plus interest which attaches to any settlement or award in your favor and to the proceeds thereof, pending payment of my bill. This lien attaches to any

---

[29](...continued) Professional Conduct. Mr. Christensen offers the OPC's findings in defense of his fee arrangement with Ms. Dahl. But the OPC's decision not to impose discipline in this instance does not undermine the district court's findings and conclusions. Accordingly, we grant no deference to the OPC's opinion in this matter.

[30] The district court determined that Mr. Christensen's claimed fees are unreasonable in the context of determining whether Dr. Dahl should be required to contribute to Ms. Dahl's attorney fees. Though our analysis focuses on whether Mr. Christensen's fees were unreasonable under rule 1.5 of the Utah Rules of Professional Conduct, the legal standard in the two contexts is largely identical. Thus, the district court's factual findings are equally relevant to our analysis here.

verdict you receive (even if I do not represent you at the time of judgment or settlement in your case if I withdraw for good cause or am discharged by you). You specifically agree to grant an immediate lien on your portion of the marital home at 4322 N. Vintage Drive[,] Provo, Utah 84606 pursuant to this paragraph and agree to grant the above attorney's lien whether or not the above cited statute would permit such a lien by signing this paragraph.

¶189  The language of the January 2010 agreement is even more sweeping:

By signing this paragraph, you agree to grant immediately a consensual lien against your present interest and the interest to be awarded to you in the action which you have filed in the Fourth District Court of Utah against Charles Dahl and an Irrevocable Trust, No. 090402989 ("Trust Action").  You also grant immediately a consensual lien against your present interest in all marital assets and against any attorneys' fee award and support award to be awarded to you in the divorce action that is the subject of this litigation, whether or not the above cited statute would grant an attorney's lien at this time.  At the time divorce is decreed by the court in a signed order this consensual lien will merge into an attorney's lien on all rights to income and assets awarded to you by the court. Pursuant to § 38-2-7(2)(a), Utah Code Annotated 2001, the firm has a lien in the amount of its unpaid attorney's fees plus interest which will attach to the proceeds of your case, including but not limited to all support payments you are awarded, as well as all assets and all judgments awarded to you.  This lien will attach whether or not we represent you at the time the judgment or support is awarded.  You authorize and direct all payments you make to be made to Christensen Thornton, PLLC balances due first and then towards the payments due to Hirschi Christensen, PLLC.

¶190 Mr. Christensen sought to perfect the security interest purportedly granted in the fee agreements by filing a UCC-1 financing statement on January 10, 2008.  That statement described

the collateral as "all proceeds from case number 064402232 in the Fourth District Court . . . including, but not limited to all alimony, property rights, business interests, and 401 K and other retirement savings and pension awards." Each of these documents purporting to grant Mr. Christensen an enforceable interest in any award granted to Ms. Dahl in the divorce action went into effect long before the entry of the divorce decree on July 19, 2010.

¶191 The question before us concerns the propriety of Mr. Christensen's lien against Ms. Dahl's interest in the marital estate prior to the entry of a decree of divorce. Rule 1.8(i) of the Utah Rules of Professional Conduct prohibits attorneys from acquiring "a proprietary interest in the cause of action or the subject matter of litigation the lawyer is conducting for a client." The rule does allow, in appropriate circumstances, an attorney to "acquire a lien authorized by law to secure the lawyer's fee or expenses." UTAH R. PROF'L CONDUCT R. 1.8(i)(1). Mr. Christensen relies on this exception to defend the liens contained in his retainer agreements with Ms. Dahl. But such reliance is misplaced.

¶192 The plain language of the rule authorizes only those liens "authorized by law." *Id.* To meet this exception, Mr. Christensen relies on section 38-2-7(2) of the Utah Code, which grants attorneys a lien on any money or property owned by the client as security against unpaid fees. Specifically, section 38-2-7(2) authorizes liens on property that is the subject of the litigation for which the attorney was retained. Were this the end of the matter, Mr. Christensen's position might be tenable. But section 38-2-7(9) specifically prohibits liens in domestic relations matters.

¶193 Utah Code section 38-2-7(9) does not authorize an attorney to acquire a lien in the representation of a client in a domestic relations matter unless a final order of divorce has been secured. The statute authorizes attorney liens in divorce actions only when

> (a) . . . the domestic relations matter has been concluded by the securing of a final order of divorce or the attorney/client relationship has terminated; and

> (b) the client has failed to fulfill the client's financial obligations to the attorney.

UTAH CODE § 38-2-7(9) (emphasis added).

¶194  Here, the liens and UCC-1 filing statement went into effect prior to the entry of the Dahls' decree of divorce.[31]  Though section 38-2-7 allows an attorney to take a lien in the subject matter of the litigation for the purposes of securing payment of his fees, subsection 9 limits this authorization in domestic relations matters in which a final order of divorce has yet to be entered.  Given this statutory directive, Mr. Christensen's liens were not "authorized by law."  As such, he cannot rely on the exception to rule 1.8(i)'s prohibition against attorneys acquiring a proprietary interest in the subject matter of their representation.[32]

¶195 Other jurisdictions have reached the same conclusion, refusing to allow attorneys to acquire a proprietary interest in the marital estate in divorce actions prior to the time that all issues relating to the use, possession, sale, and distribution of the marital property are conclusively adjudicated.  *See In re Fisher*, 202 P.3d 1186, 1195–98 (Colo. 2009) (upholding disciplinary action when attorney took a deed of trust in the marital home); *In re May*, 538 P.2d 787, 790 (Idaho 1975); Va. State Bar, Legal Ethics Op. 1653 (1995) ("In summary, as a means to secure payment of legal fees in a divorce matter, an attorney may not enter into an arrangement with a client wherein the attorney acquires an interest in the marital property, or proceeds from the sale thereof, unless a final order or decree has been entered . . . ."); Mass. Bar Ass'n, Op. No. 91-1 (1991); Me. Bd. of Overseers of the Bar, Op. 97 (1989) ("[T]he taking of an interest in the marital property by the attorney inappropriately interjects the interests of the attorney into the issues in the divorce case, creating

---

[31] The liens contained in the retainer agreement were effective on January 25, 2007, and November 1, 2009, respectively.  The UCC-1 statement was filed on January 10, 2008.  The district court did not enter a final divorce decree until July 19, 2010.

[32] Even if Mr. Christensen could acquire a valid interest in the marital estate to secure his fees, he could do so only by complying with the heightened demands of rule 1.8(a).  Such an action would be appropriate only if the terms of the transaction were fair and reasonable to the client, the terms were fully disclosed, the client was advised to seek outside counsel, and the client gave full and informed consent.  UTAH R. PROF'L CONDUCT R. 1.8(a).  We have serious reservations as to whether this transaction could satisfy rule 1.8(a).

an unacceptable risk that the judgment of the attorney will be affected by his acquisition of the interest.").

¶196  There is good reason to preclude attorneys from acquiring a lien in the property of a marital estate prior to the entry of a decree of divorce.  The value and distribution of marital property is often hotly contested by the parties to a divorce.  For example, it may be in the client's best interest to relinquish her claim to the marital home as a means of facilitating a favorable settlement.  If her attorney has an interest in the home, the attorney's interests are then directly at odds with the client's.  Moreover, marital property still subject to equitable distribution by the court should remain free from encumbrances that might serve to hinder the efficient liquidation and distribution of that property.

¶197 In this case, Mr. Christensen's attempt to acquire a lien on the entirety of Ms. Dahl's share of the marital estate runs afoul of rule 1.8(i) of the Utah Rules of Professional Conduct and section 38-2-7(9) of the Utah Code.  We accordingly hold that Mr. Christensen's retainer agreement with Ms. Dahl constituted a prohibited fee arrangement.

b.  Mr. Christensen's Fees Were Unreasonable, in Violation of Rule 1.5(a) of the Utah Rules of Professional Conduct

¶198 Mr. Christensen's fees not only violated rule 1.8, they were unreasonable.  Rule 1.5(a) of the Utah Rules of Professional Conduct prohibits an attorney from making arrangement for, charging, or collecting unreasonable fees or unreasonable expenses.  The rule lists a variety of factors courts should consider when determining the reasonableness of an attorney's fee request, including reasonable assessments of the time and labor involved, the amount in controversy and the results obtained, the novelty of the legal issues, the customary fees for similar services, any time constraints imposed by the circumstances, and the experience and ability of the lawyer performing services.  UTAH R. PROF'L CONDUCT R. 1.5(a).

¶199 At the time of trial, Mr. Christensen claimed Ms. Dahl owed him over $2.1 million in attorney fees, costs, expenses, and interest.  As discussed above, the district court made extensive findings of fact regarding Mr. Christensen's claimed fees.  Though the district court's analysis was made in the context of considering reasonableness as a factor in determining whether to require Dr. Dahl to pay Ms. Dahl's attorney fees pursuant to section 30-3-3 of the Utah Code, these factual findings are equally relevant to a

determination of reasonableness under rule 1.5(a).  *See Cabrera*, 694 P.2d at 624 (recognizing that reasonableness of a fee award incorporates the standards for reasonableness contained in the Rules of Professional Conduct).

¶200  The district court's detailed factual findings persuasively establish that Mr. Christensen's fees were unreasonable.  The district court was especially troubled by Mr. Christensen's testimony that "the fee arrangement with the lien was structured so that his firm would receive payment, regardless of any ruling by [the district court] that the fees were or were not reasonable."  We are similarly troubled.

¶201  The district court carefully considered Mr. Christensen's affidavit in support of his fee request and concluded that the hours claimed were "unreasonably large."  For example, Mr. Christensen's firm billed Ms. Dahl for 1,900 hours in 2007, only 53.3 of which were accounted for by court appearances and depositions.  The district court noted that "[t]he bill for 2007 was the equivalent of a single, full time attorney billed at somewhere between $180 and $250 per hour."  For 2009, the firm billed 2,981 hours through the end of October.  Although the court acknowledged that preparation for trial can require significant hours, it found that the "huge, almost impossible hours recorded during the trial months . . . appear to be an attempt to gain an understanding of evidence and facts that should have been mastered months earlier."  The district court also questioned Mr. Christensen's claim for hundreds of hours spent on "review" of the case file, finding that "the time attributed to that activity in his case [was] grossly inappropriate."

¶202 Moreover, the district court found that the strategy employed by Mr. Christensen was wholly ineffective at producing favorable results for Ms. Dahl.  For example, Mr. Christensen failed to provide competent evidence as to Ms. Dahl's financial need for alimony or an attorney fee award.  As a result of this deliberate and ill-conceived choice, Ms. Dahl received neither temporary nor permanent alimony and the district court declined to award her any attorney fees.  Mr. Christensen also employed a litigation tactic involving "aggressive use of motions to reconsider and clarify." According to the unrefuted factual findings of the district court:

> Virtually every ruling of the Court or the Commissioner . . . was followed by a flurry of motions to challenge, reconsider or delay the impact of the original decision.  These motions served to delay

compliance with orders of the Court, and rarely produced important or necessary clarification. They also substantially increased attorney hours and expenses without materially advancing the case.

We agree with the district court that these tactics delayed the proceedings and served only to increase the fees charged to Ms. Dahl.

¶203 Mr. Christensen's handling of discovery was similarly fraught with difficulties. Despite an order closing fact discovery in January 2009, Mr. Christensen continued to pursue additional discovery connected with the Dahls' children well after that date. In his affidavit, Mr. Christensen claims "hundreds of thousands of dollars worth of time and fees related to discovery of financial matters." Yet, on the eve of trial, Mr. Christensen continued to seek discovery as to financial matters. We agree with the district court that "the only possible conclusion is that the discovery was not carefully managed or focused, and that the extremely high fees related to the process were not warranted."

¶204 Finally, we are extremely troubled by Mr. Christensen's handling of the pretrial disclosure process. As we have discussed, despite repeated requests from the district court, Mr. Christensen failed to properly disclose the exhibits he intended to offer at trial. As a result, the district court excluded most of Ms. Dahl's trial exhibits, leaving Ms. Dahl at a substantial disadvantage. Similarly, Mr. Christensen failed to properly designate Ms. Dahl's expert witnesses or to submit proper expert witness reports. The district court correctly refused to allow the experts' testimony, which further prejudiced Ms. Dahl. And yet, Mr. Christensen's affidavit seeks over $327,000 in fees for these experts—experts who did not materially aid in the resolution of the case because they were not allowed to testify.

¶205 Taken together, the district court's factual findings adequately support its conclusion that Mr. Christensen's claimed fees are unreasonable. By charging these unreasonable fees, Mr. Christensen has violated rule 1.5(a). The issues presented in this case were not so novel or difficult as to require extraordinary skill on the part of an attorney. Indeed, most of the fees and expenses seem to have been driven by Mr. Christensen's inability to effectively manage basic discovery and pretrial disclosure procedures. The marital estate was substantial, but Mr. Christensen's efforts obtained no more, and arguably much less, than Ms. Dahl would have been

entitled to under any circumstances. Mr. Christensen failed to present evidence that would have entitled Ms. Dahl to both temporary and permanent alimony. He failed to join the Trust in the divorce action, despite the fact that the Trust contained marital property. As a result, the district court declined to award Ms. Dahl an equitable offset for her share of the property contained in the Trust.

¶206 In short, for all the thousands of hours billed by Mr. Christensen in the course of this litigation and his more than $2.1 million bill, the results he obtained for Ms. Dahl could only be characterized as extremely disappointing from her standpoint. Indeed, Mr. Christensen's multimillion dollar bill, if allowed to stand, will consume the entirety of Ms. Dahl's property award. When an attorney proceeds competently, but nonetheless is unsuccessful for his client, we ascribe no error. But when an attorney consistently fails to perform basic skills in a competent manner, and the client is harmed as a result, we will not allow that attorney to collect patently unreasonable fees. We hold that Mr. Christensen violated rule 1.8(i) of the Utah Rules of Professional Conduct and section 38-2-7(9) of the Utah Code by purporting to acquire an enforceable interest in the subject matter of the litigation—the marital estate. We further hold that Mr. Christensen's fees were unreasonable in violation of rule 1.5(a). We now turn our attention to the remainder of Ms. Dahl's arguments relating to attorney fees.

3. Ms. Dahl Failed to Preserve Her Argument That the District Court Improperly Allowed Dr. Dahl to Pay for His Attorney Fees from Marital Assets

¶207 Ms. Dahl asserts that Dr. Dahl was allowed to pay his attorney fees from marital assets, while she was denied the same privilege. Though we agree that such a result would be inequitable, Ms. Dahl has failed to demonstrate that she preserved this argument for appeal. Generally, we will not consider an issue that was not preserved in the district court. *Baird v. Baird*, 2014 UT 08, ¶ 20, 322 P.3d 728. For an issue to be preserved, it must have been presented to the district court in such a manner that the court had "a meaningful opportunity to rule" on it. *Hill v. Superior Prop. Mgmt. Servs., Inc.*, 2013 UT 60, ¶ 46, 321 P.3d 1054. Further, rule 24(a)(5)(A) of the Utah Rules of Appellate Procedure requires parties to include a "citation to the record showing that the issue was preserved in the trial court."

¶208 In her brief, Ms. Dahl provides two citations to transcripts in which Dr. Dahl testified that he paid his attorneys from a Wells Fargo account ending in 9566. Our own examination of the record reveals that the district court determined that this account contained marital funds. Thus, it appears that Ms. Dahl has identified factual support for her assertion. But there are no indications in Ms. Dahl's appellate briefing that she ever objected to Dr. Dahl's conduct before the district court. We find no indication that the district court was ever asked to determine whether Dr. Dahl was, in fact, utilizing marital resources to pay his attorney fees or that Ms. Dahl requested a credit for such fees in the property distribution. Without some indication that the district court was given an opportunity to rule on Ms. Dahl's claims, we cannot determine if the court erred. And we decline to undertake the overwhelming task of searching through the voluminous record in pursuit of such an indication. Accordingly, we will not consider this issue.

### 4. Ms. Dahl Is Not Entitled to Attorney Fees Incurred on Appeal

¶209 Finally, Ms. Dahl requests that we award her attorney fees and costs associated with this appeal. "Generally, when the trial court awards fees in a domestic action to the party who then substantially prevails on appeal, fees will also be awarded to that party on appeal." *Kimball*, 2009 UT App 233, ¶ 52 (internal quotation marks omitted). We decline to award Ms. Dahl her fees on this appeal because she was not the prevailing party below and she has not substantially prevailed on appeal.

### 5. We Invalidate Mr. Christensen's Fee Agreements with Ms. Dahl and Refer Mr. Christensen to the Office of Professional Conduct

¶210 Our review of Ms. Dahl's claim for attorney fees leaves us highly troubled. We are particularly troubled by the relative attention paid to the claim for attorney fees in Ms. Dahl's appellate brief. For example, Ms. Dahl's counsel devoted nearly seventeen pages of her appellate brief to her request for attorney fees while devoting less than two pages to Ms. Dahl's request for joint custody of her children. While counsel is certainly entitled to pursue an award of fees on his client's behalf, the focus on the attorney fees issue to the exclusion of issues such as custody raises serious concerns.

¶211 We agree with the district court that Mr. Christensen's claimed fees in this matter are staggeringly large and unreasonable as a matter of law, especially in light of the poor results achieved for

Ms. Dahl. We are further troubled by Mr. Christensen's attempt to obtain an enforceable interest in Ms. Dahl's share of the marital estate through liens and a UCC-1 filing statement. The clear language of rule 1.8 prohibits an attorney from obtaining such an interest in the subject matter of the litigation. Mr. Christensen ignored this clear directive, along with the plain language of section 38-2-7(9) of the Utah Code, when he purported to take an immediate lien on the marital estate. We agree with the district court that the only reasonable conclusion to draw is that Mr. Christensen intended to recover his exorbitant fees, regardless of any finding of reasonability by the court. Because Mr. Christensen's fee arrangement with Ms. Dahl violated rules 1.8 and 1.5 of the Utah Rules of Professional Conduct and section 38-2-7(9) of the Utah Code, we hereby invalidate the fee agreements and refer Mr. Christensen to the Office of Professional Conduct for further disciplinary proceedings. Mr. Christensen may not rely on his retainer agreements with Ms. Dahl as a basis to collect his fees.[33]

---

[33] Any legal or equitable obligation owed to Mr. Christensen by Ms. Dahl is beyond the scope of this opinion inasmuch as any further attempt by Mr. Christensen to recover fees in this matter must be accomplished through a separate suit. *See McDonald v. McDonald*, 866 P.2d 1253, 1254–55 (Utah Ct. App. 1993) (noting that an attorney is not a party to the underlying action and must therefore bring a separate action to recover fees). But our review of this case leaves us with serious doubts as to the quality of Mr. Christensen's representation of Ms. Dahl. We acknowledge that not all of the facts are before us. But those that are before us evidence a stunning failure to competently represent Ms. Dahl. For example, Mr. Christensen's failure to properly designate expert witnesses and disclose trial exhibits left Ms. Dahl without any expert testimony relating to the division of the marital assets. Mr. Christensen's failure to conduct effective discovery contributed to Ms. Dahl's inability to fully assert her claims to various assets. Counsel's approach to Ms. Dahl's claim for temporary and permanent alimony is especially troubling. Though it was possible that Mr. Christensen's failure to comply with the district court's orders to produce a proper financial declaration was compounded by a lack of cooperation from Ms. Dahl, the record before us suggests the failure was primarily one of counsel. If so, counsel's failure likely
(continued...)

## CONCLUSION

¶212 Because we conclude that the Trust should have been joined as a party to the divorce action, we consolidate the trust and divorce cases and remand the consolidated case to the divorce court for further proceedings consistent with this opinion. As to the Trust, we hold that Utah law applies, that the Trust is revocable as a matter of law, and that Ms. Dahl is entitled to withdraw her share of the marital property she contributed to the Trust as a settlor. On remand, the district court should determine what property contained in the Trust is properly characterized as marital property and either credit Ms. Dahl with an offset equal to the value of that property or allow Ms. Dahl to withdraw her share of the property.

¶213 In the divorce action, we first hold that Ms. Dahl has failed to establish any grounds for finding that Judge Taylor was biased against her. Second, we conclude that the district court did not abuse its discretion in its evidentiary rulings. Third, we hold that the district court did not abuse its discretion when it declined to award Ms. Dahl either temporary or permanent alimony. Fourth, as to the district court's division of the marital property, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Fifth, we hold that the district court did not abuse its discretion when it awarded Dr. Dahl sole legal and physical custody of the couple's children. Finally, we hold that the district court did not err when it declined to award Ms. Dahl her attorney fees in the divorce action. Further, we invalidate Mr. Christensen's fee agreements with Ms. Dahl on the grounds that they violate rules 1.5 and 1.8 of our Rules of Professional Conduct and refer Mr. Christensen to the Office of Professional Conduct for disciplinary proceedings arising from these rule violations.

---

JUSTICE DURHAM, dissenting:

¶214 I agree with almost all of the majority opinion and compliment the author's comprehensive treatment of a complex and challenging case. I cannot agree in the end, however, with the holding affirming the trial court's failure to impute to Ms. Dahl some need for basic living expenses consistent with the parties' lifestyle

---

[33](...continued)
cost Ms. Dahl the alimony to which she may otherwise have been entitled.

during the marriage. There is no question that, during their marriage, Dr. and Ms. Dahl enjoyed considerable wealth and made commensurate choices about the material quality of their life. There is also little question, in my mind, that Ms. Dahl, given her age, her health, and her lack of any employment experience for the last twenty years, has little or no significant earning capacity, while Dr. Dahl's capacity for extremely high earnings continues. The record reflects that during their separation, Dr. Dahl voluntarily paid Ms. Dahl over $4,000 per month for her maintenance.

¶215 It is true that Ms. Dahl's testimony about her expenses appears to have been unrealistic and exaggerated, as well as undocumented. Given the overall dismal and inadequate performance of her counsel, however, I believe the district court should have afforded Ms. Dahl some leniency, and acknowledged that all persons have basic needs for housing, food, transportation, medical expenses, clothing, and the like. In these circumstances, an imputation of basic expenses predicated on readily available information about the cost of living in Utah would probably have yielded an alimony award at least in the vicinity of Dr. Dahl's voluntary temporary payments. And given the parties' historic lifestyle choices, which Dr. Dahl is free to continue, I believe, contrary to the majority's conclusion, that this *is* a case where the failure to award alimony runs counter to one of the underlying policy justifications of bringing the recipient spouse as near the standard of living enjoyed during the marriage as possible.

¶216 The majority sees the question differently, relying exclusively as I understand it, on the $1.5 million dollar award from the marital estate to Ms. Dahl, and the conclusion that this amount "would enable her to enjoy a very comfortable standard of living." It is true that this amount is a considerable sum, but it is not at all clear to me that Ms. Dahl, who apparently has no income and little prospect of acquiring any, will be able to enjoy anything like the marital standard of living, or the continuing standard enjoyed by Dr. Dahl, as a result of this award. The earnings and capital stemming from this award will need to cover not just Ms. Dahl's current living expenses, but also her retirement needs. A cursory review of publicly available information reveals that at current interest rates and withdrawal levels that will allow her funds to see her through, Ms. Dahl will be lucky to have fifty to sixty thousand dollars a year on which to live. *See, e.g.,* Jeff Sommer, *For Retirees, a Million-Dollar Illusion*, N.Y. TIMES, June 9, 2013, at BU1 (citing a four percent annual

JUSTICE DURHAM, dissenting

withdrawal rate as "a common, rule-of-thumb drawdown" for a retirement account). For most people, of course, that amount would be more than adequate, but it does not remotely compare with the marital standard of living, or with Mr. Dahl's postdivorce expectations. Thus, in this case, I would hold that the district court abused its discretion in failing to impute basic costs of living even in the absence of compliance by Ms. Dahl's counsel with the (perfectly reasonable) requests of the court. Ms. Dahl's prospects are significantly disproportionate to that of her former spouse, and to the expectations that she should have been entitled to after a long-term marriage conducted in circumstances of great material comfort.

¶217 I also find that the district court applied the wrong legal standard to its determination to deny permanent alimony. The court ruled that "alimony may not be awarded without specific findings of the need of the recipient spouse." I disagree with this conclusion of law. The controlling statute mandates that courts "shall consider" seven enumerated "factors in determining alimony," including "the financial condition and needs of the recipient spouse." UTAH CODE § 30-3-5(8)(a); *accord Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985) ("financial conditions and needs" of the recipient spouse "must be considered in fixing a reasonable alimony award"). Although courts certainly must consider the financial need of the recipient spouse, among other mandatory factors, the absence of evidence on any one factor does not require the court to deny an award of alimony. The lack of evidence of need may certainly affect the court's alimony determination, but it is not necessarily dispositive. Because need is a factor relevant to a holistic alimony determination, rather than a required element, I would hold that the district court erred when it ruled that the absence of credible evidence of need required a complete denial of an alimony award.

———————